Michael **RODRIGUEZ,** Norma Rodriguez, Alaina Rodriguez and Neko Rodriguez, minors by Norma Rodriguez, their natural mother and guardian, and Estabanis, Plaintiffs,

v.

The CITY OF NEW YORK, the Police Department of the City of New York, Captain John J. Costello, and Lieutenant Robert McCarthy, and Unknown Civilian or Sworn Executive or Management Employees of the New York City Police Department, Defendants.

No. 95 Civ. 431 (BDP).

United States District Court, S.D. New York.

June 6, 1996.

Peter J. Blessinger, New York City, for Plaintiffs.

Guy Cohen, New York City Corporation Counsel, New York City, for Defendants.

## MEMORANDUM DECISION
## AND ORDER

PARKER, District Judge.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 alleging that employees of the New York City Police Department, including defendant Captain John J. Costello ("Costello") and Defendant Lieutenant Robert McCarthy ("McCarthy"), conducted unreasonable searches. Plaintiffs seek damages for three separate violations of their fourth and fourteenth amendment rights arising out of defendants' search of: (1) the Rodriguez home; (2) Michael Rodriguez's automobile; and (3) Michael Rodriguez's locker.

Before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. Rule 56. For the reasons set forth below, the motion is granted.

### FACTS

On September 25, 1992, John Young and Umberto Arroyo, Police Department detectives, were assigned to the 34th Precinct Detective Squad. At approximately 8:00 p.m. on September 25, 1992, the two were involved in the investigation of a double homicide at 176th Street and Amsterdam Avenue, New York. The victims were found in a parked car.

Shortly thereafter, Arroyo drove the car to the 34th precinct garage, where Rodriguez was present. Since neither Arroyo, Young nor Rodriguez had a key to the trunk, Arroyo and Young attempted to force it open. At some point, Rodriguez left the garage but returned within approximately five minutes.

A week later, at 11:55 A.M. on October 2, 1992, Young called the action desk at the Police Department's Internal Affairs Department ("IAD") to report a theft arising out of the homicide investigation. A police department employee ("investigator") interviewed Young on the telephone. The phone conversation was taped, and Lieutenant Robert McCarthy, an investigator with the Police Department's Internal Affairs Division, listened to it shortly after it was received. The following is a portion of the phone conversation:

Young: There was a homicide last week. And when the car was brought into the precinct to be vouchered, the trunk was searched, and money was found. And two officers took money, and I was standing there. And at the end of this, I was given money, and said, "Take this." And I said that I didn't want it. And they said, "well, whether you take this or not"—well, not they, one said it—"whether you take this or not, we'll say you took it; so you're involved, you might as well take it." So I took it and figured I'd better hold onto it, you know, as my only evidence.

\*　\*　\*　\*　\*　\*

Investigator: You said there was a homicide. Right?

Young: Right.

Investigator: And the trunk of the vehicle was searched?

Young: Right, at the precinct.

Investigator: ... So one of the officers drove back the vehicle, and you followed in the RMP?

Young: In the department car, yes ... and the vehicle was searched in the precinct, in the garage. And the money was found in the trunk.

\*　\*　\*　\*　\*　\*

Investigator: Now what did they say to you because they opened up the trunk in front of you, right?

Young: Well, one did.

Investigator: M'hm?

Young: When we pulled the car in, as far as I remember, the only key in the car was an ignition key.

Investigator: M'hm?

Young: And so they tried to get the trunk opened by prying it open by popping the lock.

Investigator: M'hm?

Young: The sergeant came in, and he had just brought back a sledge hammer from the desk, or something, to stick in the garage. And he saw us trying to get the trunk opened.

Investigator: M'hm?

Young: And he came over with the sledge hammer, and we tried and we popped the lock.

Investigator: M'hm?

Young: and then he walked away for a minute, to get—I don't know, something—a screw driver, or something to get the lock opened.

Investigator: M'hm?

Young: And the sergeant wasn't here when the trunk got opened.

Investigator: M'hm?

Young: And the detective who was with me opened the trunk and the bag was there. And you could see right away it was money.

Investigator: Okay, so the sergeant wasn't present when the trunk was opened by the detective—

Young: Right. Right. Oh God.

Investigator: And who was this detective?

Young: Arroyo.

\* \* \* \* \* \*

Two hours later, several IAD investigators, including Costello and McCarthy interviewed Young at Detective Joseph Montouri's home where, according to McCarthy, Young amplified his earlier version of the events. For example, Young told McCarthy that when Rodriguez returned to the garage area, he opened the locker where the money had been placed and removed it. According to McCarthy, Young also said that the money he had taken could be found in a metal box at his home, and that the bag in which the money was contained could be found in a park about twenty miles from Young's home. After the interview, IAD investigators recovered the money and notified Costello and McCarthy of the recovery. At 8:05 P.M., McCarthy and Costello then contacted ADA Burmeister and informed him of the events that transpired. Based on what McCarthy had told him, Burmeister drafted an affidavit for McCarthy, which stated in part: [1]

I am informed by Det. Young of the 34th precinct, as follows: On September 25, 1992 Det. Young was assigned to the inves-

tigation of a double homicide at Amsterdam Avenue and W. 176th Street, N.Y. County. He was accompanied in the investigation by Det. Humberto Arroyo. Pursuant to their investigation they removed a vehicle to the 34th precinct garage which had been involved in the homicide. Together they opened the trunk of the car and discovered a bag containing a large sum of U.S. Currency. The bag contained approximately 20 bundles of U.S. currency in denominations of $10s and $20s as well as $50s and $100s. These bundles were approximately 3 inches in thickness and were wrapped in rubber bands.

\* \* \* \* \* \*

I am further informed by Det. John Young that Detective Humberto Arroyo took the bag of money and placed it in a nearby locker. Det. Young then observed Sgt. Michael Rodriguez of the 34th precinct open the locker and take out a paper bag containing U.S. currency from the canvas bag of U.S. currency and left the garage area. Det. Young then left Det. Arroyo alone in the garage for approximately 10 minutes. Upon his return, Det. Young handed Det. Arroyo the same bag, however, there were only 3 bundles remaining inside the bag. Det. Arroyo stated in substance that Det. Young should take the bag and the bundles. Det. Young refused. Later Det. Arroyo handed the bag and its bundles to Det. Young and stated in substance "That this your part. You are part of this. If you don't take the money, I will say that you did anyway." Det. Young then took the bag and packet of money. On October 2, 1992, Det. Young gave the money to the police Department's Internal Affairs Division. The bundles as described above contained approximately $17,000 in U.S. currency.

Based on this affidavit, Judge Alfred Donati Jr. of the Criminal Court of New York City issued a warrant to search Rodriguez's home, car, locker and person.

On October 3, 1992, at 1:15 a.m. Police Department employees, including McCarthy

---

1. According to police records, McCarthy at 4:15 P.M. learned that Arroyo had left work early; and at 10:30 P.M, he learned that Rodriguez had taken the day off.

and Costello showed up at Rodriguez's residence, knocked on the door, woke the family up and showed them the search warrant. McCarthy then started to question Rodriguez, who declined to answer further questions once he realized that he was the target of a criminal investigation. The investigators split into two teams. One team of officers used a narcotics sniffing dog during the search. Apparently, McCarthy and Costello believed that the homicides were drug related and thought that the missing money would contain traces of drugs. Rodriguez's entire house and car was searched. Neither the stolen currency nor narcotics were found during the search. However, no one was physically abused nor was any property damaged during the search.

The District Attorney's office presented evidence of theft to the Grand Jury. The Grand Jury did not return an indictment. Subsequently, Rodriguez was brought up on Police Department Disciplinary Charges regarding the theft of the currency. The case was tried before the Police Department's Trial Room and Rodriguez was exonerated. This litigation followed.

## DISCUSSION

### A. Standard For Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); see also *Gallo v. Prudential Residential Servs. Ltd*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party must meet a burden of coming forward with "specific facts, showing that there is a genuine issue of fact for trial," Fed.R.Civ.P. 56(e) by a showing sufficient to establish the existence of [every] element essential to the party's case, and on, which the party will bear the burden of proof at trial.

In deciding whether a genuine issue of material fact exists, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d. Cir. 1989). The Court is to "inquire whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), however, and to grant summary judgment where the nonmovant's evidence is merely colorable conclusory, speculative or not significantly probative. *Knight v. United States Fire Ins.*, 804 F.2d 9, 12–15 (1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### B. 42 U.S.C. § 1983

42 U.S.C. § 1983 provides, in relevant part, that:

> "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."

Section 1983 is, of course, not an independent source of substantive rights but instead provides a remedy for the vindication of federal rights created by the Constitution or laws of the United States.

### 1. Immunity of New York City

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local government units are included among those "persons" to whom the Civil Rights Act of 1871 applies. Yet *Monell* held that municipalities are immune from respondeat superior liability under § 1983, and thus limited municipal liability in civil rights actions to those cases where the injuries alleged were directly caused by a municipal "policy or custom."

Here, Rodriguez has not provided evidence sufficient to show that his injuries are the result of any official municipal policy, that other similar events have occurred, or that the City failed to train its officers. As such, he has failed to set forth specific facts showing that there is a genuine issue of fact for trial. Fed.R.Civ.P. 56(e). And thus we grant summary judgment as to any claims asserted against New York City.

## 2. Officer Immunity

■■■ The Officers raise the affirmative defense of qualified immunity. Qualified immunity, of course, shields government officials performing discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The relevant question ... is whether a reasonable officer could have believed his conduct to be lawful in light of clearly established law, and the information [the officers] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). The defense of qualified immunity is established when (1) at the time the defendants acted, it was unclear whether plaintiff's asserted interests were protected by federal law, or (2) it was objectively reasonable for the defendants to believe that their actions did not violate clearly established federal law. See *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995). On a motion for summary judgment on the ground of qualified immunity, the defendants bear the burden of showing that, as to that defense, there is no issue of material fact. *Castro v. United States*, 34 F.3d 106, 112 (2d Cir.1994).

This court finds that it was objectively reasonable for McCarthy and Costello to have believed both that probable cause existed and that their actions were not contrary to federal law. Young told McCarthy that he had seen Arroyo take money from the trunk of a car and place it in a locker and that he saw Rodriguez take the money out of the locker. The fact that McCarthy did not personally witness the thefts underlying the warrant application but instead relied on what Young had told him is not fatal to the finding of probable cause. *U.S. v. Smith*, 9 F.3d 1007, 1013 (2d Cir.1993). See also Fed. R.Crim.P. 41 ("The finding of probable cause may be based on hearsay evidence in whole or in part."). Our primary concern is whether McCarthy's reliance on Young was reasonable, and whether Judge Donati was informed of sufficient facts on which to base his finding of probable cause for the search warrant. See *Smith*, 9 F.3d at 1013 (quoting *U.S. v. Brown*, 744 F.Supp. 558, 566 (S.D.N.Y.1990)). We find that McCarthy's reliance was reasonable. First, his story was corroborated when, after McCarthy interviewed him, Young turned in his portion of the money. Second, we find compelling the fact that Young incriminated himself voluntarily at the same time he implicated Rodriguez.

■■ Even if Rodriguez raises factual disputes relating to probable cause, they would be insufficient to defeat a motion for summary judgment if the resolution of these disputed issues is "not material to the ultimate resolution of the immunity issue." *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir. 1992). Disputed issues are not material if, after crossing out any allegedly false information and supplying any omitted facts, the "corrected affidavit" would have supported a finding of probable cause. *Cartier*, 955 F.2d at 845. See also *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir.1994).

Plaintiffs dispute several statements in the McCarthy affidavit.[2] First they dispute the statement "the bag contained approximately

2. Plaintiffs also point out an affidavit submitted by McCarthy in connection with this motion erroneously states that McCarthy learned certain details from Young from the taped telephone interview, which in fact he learned at the in person interview several hours later. See p. 3, supra. In response, McCarthy submitted a cor-

rected affidavit in which he explained that he learned those details in the in person interview. Plaintiffs have not provided any evidence to the contrary, and thus we do not find that there is an issue of fact as to McCarthy's recitation of the facts.

20 bundles of U.S. currency in denominations of $10s, $20s, as well as $50s and $100s." They note that before the Grand Jury, Young testified that "he couldn't make out the denominations [of the bundles]" and that "there was probably twenty bundles of money in the bag." Second, they dispute that "Det. Young then observed Sgt. Michael Rodriguez of the 34th precinct open the locker and take out a paper bag of U.S. currency and left the garage area." Again, they note that on cross examination in the Police Department's administrative trial, Young acknowledged that he could not see into the bag that Rodriguez removed from the locker. We cannot say that these inaccuracies were critical—or fatal—to the probable cause determination. Even though McCarthy may have been imprecise or even inaccurate as to the denominations of the bundles, the fact that Young reported the theft of "probably twenty bundles" of currency is sufficient to find probable cause, regardless of the denominations. Moreover, even though Young may not have seen the money in the paper bag, he saw Rodriguez pull the same paper bag out of the locker which, minutes before, Arroyo had deposited into the locker. Finally, these misstatements, whether they originated with Young or McCarthy do not evince sufficient reckless or deliberate misbehavior.[3] The fourth amendment does not require an error-free affidavit. It simply requires that police officers apprise the judicial officer who issues the search warrant of a reasonably complete and reliable basis for doing so. We believe that McCarthy's affidavit adequately accomplished that purpose. Accordingly, defendants Costello and McCarthy are entitled to qualified immunity.

### CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted.

The clerk shall enter judgment.

**SO ORDERED.**

---

3. In *Velardi,* supra, our Court of Appeals held that summary judgment is inappropriate in doubtful cases where the court is uncertain about

what weight a judge or magistrate would give the corrected affidavit. *Velardi,* 40 F.3d at 573–74. The facts before us do not present such a case.