**Harriet RAMSEUR, Plaintiff–Appellant,**

v.

**CHASE MANHATTAN BANK,
Defendant–Appellee.**

**No. 434, Docket 88–7637.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1988.

Decided Jan. 4, 1989.

---

Denny Chin, New York City (Campbell, Patrick & Chin, New York City, on the brief), for plaintiff-appellant.

Jeanne C. Miller, New York City (Kent T. Stauffer, New York City, on the brief), for defendant-appellee.

Before FEINBERG, Chief Judge, MESKILL and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Harriet Ramseur appeals from a final judgment of the United States District Court for the Southern District of New York, John F. Keenan, *Judge*, dismissing her amended complaint ("complaint") alleging that defendant Chase Manhattan Bank ("Chase" or the "bank"), her former employer, discriminated against her on the basis of her race, in violation of 42 U.S.C. § 1981 (1982), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982) ("Title VII"), and state law. The court granted summary judgment in favor of the bank on the ground that Ramseur had not made out a prima facie case of race discrimination. On appeal, Ramseur contends that the court failed to draw permissible inferences in her favor and ignored evidence that the bank's purported reasons for its treatment of her were merely pretexts for discrimination. For the reasons below, we conclude that summary judgment was improperly granted, and we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

Certain of the facts are not in dispute. Ramseur was hired by Chase in 1978 as an entry-level auditor in its general auditing department. During the next several years, she received generally favorable reviews and several promotions. In June 1985, she was promoted to the position of Vice President, Audit Manager.

In October 1985, Ramseur's immediate supervisor, Kevin Corrigan, transferred to another division of the bank. For a short

time thereafter, Ramseur reported to Frank Conticello; in mid-November 1985, Lynn Douglas became her supervisor. On November 21, 1985, Douglas told Ramseur that Ramseur had no future in the auditing department and that she should seek work elsewhere. Ramseur was to continue managing audits for as long as she was in the department. She remained in that department until May 28, 1986, at which time she was given notice that her employment with the bank would be terminated as of August 28, 1986. Her employment was in fact terminated in September 1986.

Ramseur, who is Black, commenced the present action in May 1986, alleging that Chase had discriminated against her on the basis of her race. After a period of discovery, Chase moved for summary judgment dismissing the complaint pursuant to Fed.R.Civ.P. 56.

## A. *Chase's Motion for Summary Judgment*

In support of its summary judgment motion, the bank presented, *inter alia,* deposition and affidavit evidence with respect to Ramseur's performance in 1984 and 1985. Affidavits by Conticello and Douglas stated that in 1984, Conticello had conducted a review of an audit of the bank's Bronx branch offices (the "Zerega Avenue" audit) supervised by Ramseur in 1984; Douglas was part of that review team. Conticello and Douglas were not pleased with the findings of the Zerega Avenue review, which included the finding that there were some work papers unsigned by Ramseur. In October 1985, the Comptroller of the Currency of the United States conducted a review of Chase's compliance with federal banking regulations. This review, insofar as it dealt with two audits managed by Ramseur, resulted in the bank's receiving an unacceptable rating and certain penalties, including a fine. This was the first time the auditing department had ever received an unacceptable rating and was the cause of some embarrassment to the department and the bank.

In November 1985, only two audit managers reported to Douglas: Ramseur and Stephen Chopey. Douglas stated that she was dissatisfied with the work of both. On a number of audits Ramseur had exceeded the number of hours budgeted and had gone beyond deadlines. There were also criticisms as to the manner in which Ramseur had conducted certain audits, including a complaint from Therese Molloy, division executive of the Manhattan region, that Ramseur had been abrasive at a 1984 audit closing. Accordingly, on November 21, Douglas told Ramseur that she should seek a position in another department of Chase or outside the bank. Douglas stated in her affidavit that Ramseur "was expected to continue working as an audit manager while she sought another job. I expected her to perform during that time in accordance with Chase standards and those of professional auditors." Douglas stated that she spoke to Chopey on or about December 11, conveyed to him the same criticisms she had communicated to Ramseur, and asked him too to look elsewhere for a job.

The bank also submitted an affidavit by Corrigan, Ramseur's immediate past supervisor, which stated that he had been engaged in something of a power struggle with Conticello, and that though Corrigan was satisifed with the performances of Ramseur and Chopey, Conticello had been dissatisfied. He opined that Ramseur and Chopey had been "caught in a changing of the guard and were victims of an in-house power struggle."

Chase asserted that both Ramseur and Chopey, who is White, were treated the same. Both had been promoted to the position of vice president in mid–1985 over the objections of several bank officers; in late 1985, both were told that they had no future in the audit department but were directed to continue managing audits for as long as they were in the department; both were given termination notices by Douglas on May 28, 1986. Neither Ramseur nor Chopey was replaced. In addition, Bruce Hathaway, a White audit manager in the bank's Miami office, was similarly told in December 1985 that he could not remain in the audit department because of his inadequate performance.

## B. *Ramseur's Opposition to the Motion*

Ramseur opposed the bank's motion for summary judgment, arguing that there existed genuine issues of material fact to be tried. Submitting her own affidavit and a statement pursuant to Rule 3(g) of the local court rules, and referring to documentary and deposition evidence, she disputed the bank's suggestions that her job performance had been poor and that she had been treated the same as White audit managers; she argued that both the reasons advanced for her treatment and the actual treatment accorded Chopey and Hathaway were mere pretexts to mask racial discrimination against her.

Ramseur stated that she was unaware of any opposition to her—or Chopey's—promotion to vice president in June 1985. She stated that prior to being told that she must leave the auditing department, she had received only excellent personnel appraisals and had never had any discussions with Conticello or others about her alleged poor performance. She submitted copies of bank personnel records which showed only favorable reviews through 1985. In April 1985, her evaluation by Corrigan, though listing three areas in which Ramseur should strive for improvement, concluded that she had "displayed exceptional ability and results in most all areas required of the position," and gave Ramseur the second highest possible overall rating. In three of the eight specific categories considered, Corrigan rated Ramseur's performance as "commendable," *i.e.,* "higher than normally expected, but ... still leav[ing] room for improvement"; in the other five categories, Ramseur was rated as "outstanding," *i.e.,* "indicat[ing] extraordinarily high performance, leaving little, if anything, to be desired."

With respect to the Zerega Avenue audit, Ramseur stated that her procedures had been approved by Kevin McCleerey, then the division executive of the branch audit division and that she had received neither oral nor written criticism from any of her superiors; rather, in the early fall of 1984, Conticello had made a simple inquiry of Ramseur as to whether she was aware that all of the audit work papers were not signed. Conticello then had discussed his review of this audit with McCleerey, who told Conticello that the significant papers had in fact been signed and that his criticism was uninformed. Ramseur also argued, *inter alia,* that Molloy was angry not because Ramseur had been abrasive but because the Manhattan audit had not resulted in the rating Molloy desired.

Ramseur stated that she was the only Black audit manager in the division and that other audit managers had been responsible for failures similar to those the bank now attributed to her, but they had not been transferred or fired. She pointed to one audit manager whose error in the implementation of the Bank Secrecy Act caused the bank to be fined $360,000; yet no adverse action was taken against him. She named two other audit managers who had exceeded budget for letter-of-credit and foreign-exchange audits but were not terminated or transferred.

Ramseur contended that the bank's treatment of her was not similar to its treatment of Hathaway or Chopey because (a) Hathaway's personnel file, unlike hers, contained unfavorable performance appraisals, and (b) Chopey remained employed by the bank after August 1986; indeed, she stated that Chopey had revealed to her that the bank's telling him that he must leave the audit department "did not make sense because they knew he had another job in the bank." In addition, Ramseur submitted what appears to be a Chase internal memorandum, which she stated had been delivered to her anonymously before she left the bank, purporting to describe a December 1985 meeting of Conticello, Douglas, and a vice president from the bank's human resources department, with a member of Chase's Legal Department. The memorandum focused on Ramseur and included the following note:

> Upon presenting the details of the OCC incident, it became clear to [counsel] that there might be similar cases involved. She questioned us all on the similarity of Bruce Hathaway's case with Harriet and

then Steve Chopey's. In [counsel's] opinion, if all were treated in the same fashion at the same time the Bank's case would be strengthened in the event of a suit.

## C. *The Decision of the District Court*

In an Opinion and Order dated June 7, 1988, the district court granted Chase's motion to dismiss, stating that the evidence adduced by Ramseur in opposition to the motion failed to establish a prima facie case of race discrimination. The court found that Ramseur was

> unable to refute the fact that reviews of her performance covering portions of 1984 and 1985 were not favorable. The so-called Zerega Avenue review uncovered certain defects in audits plaintiff managed. Similar flaws in performance were seen in 1985. In addition, audit plans submitted by plaintiff fell short of the unit's standard and regulation guidelines. Understandably, the new management team of Conticello and Douglas found the performance unacceptable, just as they found Chopey's performance unacceptable. There is nothing before the Court to suggest race played any factor whatsoever in defendant's decision to terminate plaintiff's employment.

*Id.* at 7.

The court dismissed Ramseur's federal claims and declined to take pendent jurisdiction of her state claims. Judgment was entered dismissing the case, and this appeal followed.

## II. DISCUSSION

On appeal, Ramseur concedes that the record contains evidence that could support an inference that some of her work may not have been satisfactory. She argues, however, that the district court failed to consider countervailing evidence she submitted and that it improperly failed to draw inferences in her favor as the nonmoving party. She contends that had the court applied proper summary judgment principles, it would have concluded that there were material issues of fact to be tried with respect to whether her job performance was adequate, whether she was treated in a manner different from White audit managers, and whether the bank's proffered reasons for its treatment of her were merely pretexts. We agree.

## A. *Principles Applicable to Claims of Employment Discrimination and to Motions for Summary Judgment*

It is established that a plaintiff in an employment discrimination case

> "has the burden[, first,] of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). In order to establish a prima facie case of racial discrimination in firing in violation of § 1981 or Title VII, the plaintiff must show that she belongs to a protected class, that she was qualified for the position, that she was discharged, and that her discharge occurred "in circumstances giving rise to an inference of racial discrimination." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987); *see Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.) (religious discrimination claim under 42 U.S.C. § 2000e *et seq.*), *cert. denied,* 474 U.S. 829, —— S.Ct. ——, —— L.Ed.2d —— (1985); *cf. Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983) (age discrimination claim under 29 U.S.C. §§ 621–634 (1976, Supp. IV 1980 & Supp. V 1981)).

In assessing the inferences to be drawn from the circumstances of the termination, the court must be alert to the fact that "[e]mployers are rarely so cooperative as to include a notation in the personnel file" that the firing is for a reason express-

ly forbidden by law. *Thornbrough v. Columbus & Greenville Railroad Co.*, 760 F.2d 633, 638 (5th Cir.1985); *cf. Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir.1979) (" 'clever men may easily conceal their motivations'" (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975))). Thus, the absence of direct or explicit evidence that a challenged personnel action was motivated by race is not fatal to a claim of race discrimination. A showing that a proffered justification is pretextual is itself sufficient to support an inference that the employer intentionally discriminated. *See, e.g., Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1396 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). Further, the plaintiff is not required to prove that the employer's proffered reasons are false but only that they were not the only reasons and that race made a difference. *See Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d at 1042; *Pico v. Board of Education, Island Trees Union Free School District*, 638 F.2d 404, 437 (2d Cir.1980) (Newman, *J.*, concurring in the result), *aff'd*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

On a motion for summary judgment, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir.1987) (quoting *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)); *see* Fed. R.Civ.P. 56(c). In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought. *E.g., Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d at 57; *Schwabenbauer v. Board of Education*, 667 F.2d 305, 313 (2d Cir.1981) ("In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party."). We

have repeatedly noted that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon*, 759 F.2d at 998 (dictum); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984) (citing cases); *see Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

In deciding Chase's motion in the present case, the district court did not discuss the principles governing summary judgment motions. We note that the court was perhaps hampered by the performance of Ramseur's original attorney in this case, whom the court castigated for not submitting any memorandum of law in opposition to summary judgment (and who we are informed is currently suspended from the practice of law in New York State). Thus, though certain factual materials were submitted to the district court, Ramseur's original attorney neither reminded the court that it was required on such a motion to draw all permissible inferences in Ramseur's favor nor pointed out what inferences favorable to Ramseur were available.

Ramseur's new attorneys have argued that her former attorney also failed to submit in opposition to the bank's motion all of the pro-plaintiff evidence that was available. We need not consider this contention since we conclude that the present record would suffice to support inferences by the factfinder in Ramseur's favor on a number of issues.

B. *The Availability of Inferences Sufficient To Present Triable Issues of Fact*

■ The district court did not refer to the evidence adduced by Ramseur in opposition to Chase's motion for summary judgment and does not appear to have drawn any inferences whatever in her favor. We conclude that, when inferences are drawn in her favor, there are genuine issues of material fact to be tried, making summary judgment inappropriate.

First, though Chase contended that Ramseur's work performance was unsatisfactory and the district court explicitly

credited this contention, Ramseur submitted evidence that for eight years prior to being told to look for another job, she had received highly laudatory personnel evaluations. The only 1985 evaluation currently in the record shows that Ramseur was rated outstanding in five of the eight categories considered and in the next highest rank in the other three categories. It was not until after Conticello and Douglas decided that Ramseur must go that Ramseur's personnel file contained any suggestion that her performance was unacceptable.

In addition, though the affidavit materials submitted by Chase indicated that Ramseur had performed poorly in the Zerega Avenue audit, that audit, the centerpiece of the bank's criticism of her performance, was concluded and reviewed in 1984. Ramseur stated in her affidavit that she was never criticized for that audit until Conticello and Douglas decided to oust her, and it is undisputed that in mid–1985, well after the audit review had been conducted and all the facts were known, Ramseur was promoted to the position of vice president. Further, though not highlighted for the district court by Ramseur's original attorney, portions of Chase's own submission lent additional support to Ramseur's contention that her performance in the Zerega Avenue audit was not seriously flawed. Thus, one Chase document indicated that McCleerey, Ramseur's then-supervisor and Corrigan's predecessor, had "explained the situations surrounding the audit to [the] satisfaction" of Conticello's supervisor. The same document stated that "Corrigan, who inherited the Branch Audit Group in November 1984, said he spoke with [Conticello's supervisor] and McCleerey and as a result discounted completely any allegations of poor performance against Ms. Ramseur."

Further, if Ramseur's performance were so unsatisfactory that she was not qualified to be an audit manager, one might have expected the bank to remove her from the audit manager position as quickly as possible. Instead, Douglas stated in her affidavit that Ramseur "was expected to continue working as an audit manager while she sought another job. I expected her to perform during that time in accordance with Chase standards and those of professional auditors." Ramseur's post-Zerega Avenue promotion, her personnel files, and Chase's willingness to continue having her serve as an audit manager for the better part of a year after telling her she must move on, together with its conceded expectation that she could perform in accordance with Chase's standards, surely created a genuine issue as to whether, as Chase argues, Ramseur's performance had been unsatisfactory.

Further, Ramseur pointed to several instances in which she claimed White audit managers had failed to meet their budgets for audits or had failed to comply with federal law in a way that caused the bank to be fined, failures which were similar to those cited by the bank as reasons for their treatment of Ramseur but which did not result in similar treatment of those other audit managers. From these instances, a factfinder could infer that Ramseur was treated unfavorably in comparison to White audit managers whose failures paralleled hers.

Finally, Ramseur's submissions raised genuine issues as to whether the reasons advanced by the bank for its treatment of her were merely pretexts. The bank's reliance on the Zerega Avenue audit, for example, could be viewed by a factfinder as pretext since flaws relating to Ramseur's supervision of that audit were discussed, according to the bank, when Ramseur was being considered for promotion. Those flaws did not then lead to her transfer or termination; instead, she was promoted. Further, though Chase contended that Ramseur was treated in the same way as Chopey and Hathaway, Ramseur contended that they were treated differently. For example, she stated that Chopey himself believed his treatment was not genuinely the same as that of Ramseur because he had another job within the bank. It appears that Chase's own submission in support of summary judgment lends support to Ramseur's statement, for the affidavit of the Chase vice president for whom Cho-

pey went to work in 1986 stated that Chopey told her that his decision to leave the auditing division was voluntary and that "it was 'news to him that his performance' was questioned." (Affidavit of Chase vice president Eileen Wynne.)

Ramseur contends that the Chase internal memorandum reflecting advice to Conticello and Douglas to give similar treatment to Ramseur, Chopey, and Hathaway is further proof of pretext. Chase argues that this memorandum should not enter into consideration of whether Ramseur made out a prima facie case or presented evidence of pretext because Rule 56(e) requires the party opposing summary judgment to present evidence that will be admissible at trial, and it argues that this memorandum will be inadmissible for at least two reasons. First, Chase points out that Ramseur states that she received this document anonymously and it argues that she thus cannot show its authenticity. Second, it argues that even if the document is authentic, it is protected by the attorney-client privilege. Finally, Chase argues that in any event the memorandum is not probative because it does not show "that Chase was planning to discriminate against plaintiff."

Plainly the bank is correct that Ramseur would have to lay an appropriate foundation in order to have the memorandum admitted into evidence. Equally plainly, even if authenticity were established, the document reflects the request for and the giving of legal advice, which could result in its exclusion. We do not attempt to determine here whether either of these objections will be sustainable, but for the reason indicated below, we do not think that on this summary judgment motion the memorandum could appropriately be ignored entirely.

Notwithstanding the possible inadmissibility of the memorandum itself, its mere existence suggests that Ramseur may well be able to present evidence of the fact that Chase consulted its attorney in December 1985 with respect to its treatment of Ramseur. Though the statements made to the attorney for the purpose of seeking legal advice and the advice given by the attorney are normally protected by the privilege, the fact and date of the consultation would not be privileged. *See, e.g., In re Shargel,* 742 F.2d 61, 63 & n. 3 (2d Cir.1984). If the meeting indeed took place in December, it occurred after Ramseur was told she must look for another job; and if the meeting took place before December 11, Chopey was not in fact treated similarly until after consultation with an attorney. Thus, the finder of fact, even without being informed as to what the attorney had advised, may be able to infer from the sequence itself that the bank's treatments of Chopey and Hathaway were not based on the merits of their own performances but were merely strategic afterthoughts designed to mask discriminatory treatment already given Ramseur.

In sum, Ramseur disputed the bank's contentions as to several material factual issues; her assertions were neither vague nor conclusory but were explicit and detailed; and in several instances, the inferences for which she argued could be drawn from Chase's own documents. We conclude that if all permissible inferences are drawn in favor of Ramseur, her claim of employment discrimination cannot be dismissed as a matter of law. It may be that after a trial a jury will find, permissibly, that the bank did not act with discriminatory intent. The question of which inference to draw, however, is a matter exclusively within the province of the jury. *See Wade v. Orange County Sheriff's Office,* 844 F.2d 951 (2d Cir.1988) (jury trial available on claim under § 1981; court deciding Title VII claim is bound by jury's findings of facts common to both claims). The determination that there was no race discrimination as a matter of law was improper.

## CONCLUSION

The judgment of the district court is vacated, and the matter is remanded for trial. Costs to plaintiff.