Bonnie CATONE, Plaintiff,

v.

Gary SPIELMANN, Individually and in his capacity as Acting Executive Deputy Commissioner of the New York State Department of Environmental Conservation, James Doe, individually and officially, Michael Roe, individually and officially, Michael Doe, individually and officially, George Roe, individually and officially, and the State of New York, Defendants.

No. 95–CV–1062.

United States District Court, N.D. New York.

June 19, 1997.

Lovett & Gould, White Plains, NY (Kim Berg, of counsel), for Plaintiff.

Dennis C. Vacco, Attorney General, State of New York, Albany, NY (Robert A. Sieg-

fried, Asst. Attorney General, of counsel), for Defendants.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

This § 1983 action focuses upon plaintiff's discharge from her position with the New York State Department of Environmental Conservation ("DEC"). Plaintiff claims, *inter alia*, that such discharge was in violation of her rights of due process and free speech under the First and Fourteenth Amendments to the United States Constitution. Defendants now move for summary judgment dismissing the Complaint.

## I. BACKGROUND

### A. Facts:

**Plaintiff Bonnie Catone** is an honorably discharged veteran, having served in the United States Air Force during the Vietnam War. (Catone Aff. Ex. A). In September of 1986, plaintiff was appointed to the permanent position of Special Assistant to the General Counsel ("Special Assistant") of the New York State Department of Environmental Conservation ("DEC").[1] The position was classified as exempt under the New York Civil Service Law. (Spielmann Aff. ¶ 9; Catone Aff. ¶ 5).

Plaintiff worked on a part-time basis, sharing her duties with Susan Zucker. (Catone Aff. ¶ 6 and Ex. D; Spielmann Aff. ¶ 12). Her salary of $39,336.00 was pro-rated from the full-time salary of $66,342.00, since plaintiff worked 60% of the full-time position. (Spielmann Aff. ¶ 12). The General Counsel

of the DEC during plaintiff's tenure was Marc Gerstman.

The position of Special Assistant[2] encompassed three primary areas of responsibility: (1) tracking legislation and coordinating preparation of legislative comments on issues before Congress; (2) coordinating preparation and delivery of testimony before Congressional committees; and (3) administering an information services program to keep DEC staff abreast of all Congressional developments. (Spielmann Aff. Ex. 4; Catone Aff. Ex.D).[3] What these responsibilities entail and imply are at the heart of this motion, and will be discussed in more detail in the discussion section *infra*.

During the period leading up to her termination, plaintiff was a supporter of former New York Governor Mario Cuomo and of the Democratic Party, having solicited assistance from the national Democratic Party in obtaining the Special Assistant position in 1986. (Catone Aff. ¶ 41). Cuomo was defeated by George Pataki in the November 1994 gubernatorial race. Soon thereafter, in March of 1995, Gov. Pataki appointed **defendant Gary L. Spielmann** to the position of Executive Deputy Commissioner of the DEC. Between Pataki's election in November of 1994 and his inauguration in January of 1995, Spielmann was a member of Governor Pataki's transition team, working with the DEC and the Department of Parks and Recreation. (Spielmann Dep. [Catone Aff. Ex 4] at 11–12). On January 26, 1995, Spielmann began work at the DEC. (*Id.* at 12). He was officially appointed Executive Deputy Commis-

---

1. The letter confirming plaintiff's appointment advised her that she should provide records of her discharge papers if she had served in the military. (Catone Aff. Ex. B).

2. Plaintiff asserts that her functional title was Federal Legislative Liaison. (Catone Aff. ¶ 3; *see also* affidavit of Langdon Marsh ["Marsh Aff."] ¶ 2). In this capacity, she contends that she reported to Gerstman through Susan Weber, the Director of the Legislative and Federal Liaison Unit ("LFLU"), and Janie Corr, the Special Counsel for Legislation, but never to the DEC Commissioner himself. (*Id.* ¶ 8).

3. Plaintiff's main area of responsibility was in federal legislation. In 1992, the responsibility

for coordinating federal legislative affairs was assigned by the DEC Commissioner to the LFLU, under the supervision of the DEC General Counsel through the Special Counsel and the LFLU Director. (Gerstman Aff. ¶ 3). By delegating such authority to the LFLU, the DEC hoped to "have a federal legislative program which allows active and early participation in the shaping of federal legislation and which works within the Department to keep staff current on all Congressional developments." (Spielmann Aff. Ex. 18). Moreover, the LFLU was to serve "as the conduit through which policy statements, comments, briefing materials and legislative status reports [would] be relayed between DEC and New York's Washington, D.C. office." (*Id.*)

sioner in March of that year. (Spielmann Aff. ¶ 1).

Sometime in early March of 1995, Spielmann and two other DEC officials began consideration of a plan to reorganize the DEC. (Spielmann Dep. at 17–20). The reorganization was based in part on Governor Pataki's overall campaign theme of less government (Spielmann Aff. ¶ 2) and in particular on the feeling that "there were far too many attorneys working at DEC, that they were much too aggressive in their demeanor and their philosophy ... [and] that they weren't getting the job done for all of the heavy handedness." (Spielmann Dep. at 22). Some of the new administration were of the opinion that the DEC was contributing to New York's loss of businesses and jobs. (Spielmann Aff. ¶ 3; Spielmann Dep. at 22).

As part of the reorganization process, Spielmann was to determine "what talent was [at DEC] ... and what was the full range of appointment opportunities for the new administration" (Spielmann Dep. at 21), with an eye toward who might be retained and who might be let go. (Id. at 35). As to the latter, Spielmann asserts that it was the new administration's sense that "a lot of people appointed in policy making positions were very much identified with the previous administration and that might make it very difficult for them to do an effective job working for a new governor and the new leadership of the agency." Id.

The reorganization team wanted to downsize the DEC General Counsel's office. (Spielmann Dep. at 39). Thus, Spielmann, along with two other members of the new DEC leadership, Connie Barella and Gavin Donohue, transferred the LFLU from the General Counsel's office to the Office of the Assistant Commissioner for External Affairs. (Spielmann Aff. ¶ 7; Spielmann Dep. at 41). As part of this transfer, Spielmann decided that plaintiff's job should be "abolished." (Spielmann Dep. at 42). The decision was Spielmann's alone; when he made it, he was aware of plaintiff's status as a veteran. (Spielmann Dep. at 71).

Spielmann informed plaintiff of his decision in person on March 10, 1995. Plaintiff also received a letter from Spielmann, dated March 10, 1995. That letter stated, in pertinent part, as follows:

I have been directed to formally notify you that your services as Special Assistant to General Counsel will no longer be required.

The effective date of your termination of employment will be the close of business today, March 10, 1995.

(Catone Aff. Ex. E). On March 16, 1995, plaintiff received a letter from Acting General Counsel Frank V. Bifera inviting plaintiff to reapply for her position. (Id. Ex. F). Plaintiff did so on March 22, 1995 (id. Ex. G), but was not selected to continue in her position. (Id. Ex. 1).

**B. Procedural History:**

Plaintiff filed her Complaint on August 2, 1995. The Complaint contains four counts: two under 42 U.S.C. § 1983 alleging violations of her free speech and procedural due process rights under the First and Fourteenth Amendments, and two for violations of her speech and due process rights under the New York State Constitution. Defendants answered on October 2, 1995.

After serving their motion for summary judgment on plaintiff, defendants moved for a stay of discovery during the pendency of the motion. Magistrate Judge Ralph W. Smith granted the stay on December 30, 1996. On January 21, 1997, plaintiff moved, pursuant to Fed.R.Civ.P. 56(f), for further discovery. In the meantime, defendants filed their summary judgment motion on January 28, 1997. On February 18, 1997, this Court denied plaintiff's request for further discovery and directed plaintiff to respond to the summary judgment motion.

All papers were filed and the motion was set for a return date of April 14, 1997. The motion was taken on the parties submissions alone; oral argument was not heard.

**II. DISCUSSION**

**A. The Standard for Summary Judgment:**

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a

matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party, *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975), and the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985) *cert. denied* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56).

It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

## (1) Plaintiff's First Amendment Claim

Plaintiff alleges in her Complaint that defendants terminated her in retaliation for her support of Governor Cuomo during the 1994 campaign, in violation of her First Amendment rights. (*See* Compl. ¶¶ 12, 21).

It is well-established that "'[t]he First Amendment protects political association as well as political expression.'" *Elrod v. Burns*, 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976) (quoting *Buckley v. Valeo*, 424 U.S. 1, 11, 96 S.Ct. 612, 630–31, 46 L.Ed.2d 659 (1976)). Thus, the politically motivated dismissal of a public employee in most instances is unconstitutional under the First and Fourteenth Amendments. *See Elrod*, 427 U.S. at 373, 96 S.Ct. at 2689–90; *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir.1995). Such constitutional protection, however, is not afforded to employees in "policy making" or "confidential" positions. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 71 n. 5, 110 S.Ct. 2729, 2735 n. 5, 111 L.Ed.2d 52 (1990); *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2686–87.

For purposes of this motion only, defendants concede that plaintiff's termination, at least in part, may have been politically motivated. (Def. Mem. in Support at 7). The only question presented with respect to plaintiff's First Amendment claim is thus whether plaintiff was a policy maker or confidential employee.

### (a) Was Plaintiff a Policy Maker?

While the exception generally applies to "policy makers," the Supreme Court has made clear that "the ultimate inquiry is not whether [such a label] fits a particular position; rather, the question is whether the [employer] can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980); *see also Gordon v. County of Rockland*, 110 F.3d 886, 887 (2d Cir.1997) (noting that *Branti* "recast the exception" for policy makers); *Kaluczky*, 57 F.3d at 208 ("We use the term 'policymaker' as a convenient shorthand for a government employee who occupies a position for which party affiliation, loyalty or confidence are appropriate.") (internal quotations omitted). The Second Circuit specifically interprets *Branti* to mean that "'political affiliation is an appropriate requirement *when there is a rational connection between shared ideology and job performance.'*"

*Gordon,* 110 F.3d at 889 (emphasis added) (quoting *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988)).

■ This analysis involves discerning the duties that inhere in plaintiff's job, rather than simply examining the duties actually performed by her. *Gordon,* 110 F.3d at 888; *see also Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993) ("[W]e do not merely look at [the plaintiff's] actions taken while in office. Rather, we also look at the power with which she is vested by law, and which is inherent in the office."). The contours of the exception are defined by a number of factors that a court should consider.

> These factors include whether the employee (1) is exempt from civil service protection, (2) has some technical expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

*Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994). The list is not exhaustive, nor is any single factor dispositive. *Id.* at 486.

■ First, plaintiff's position is exempt from civil service protection. (Pl.L.R.7.1(f) Stat. ¶ 3; Def. L.R. 7.1(f) Stat. ¶ 4). In determining which positions are exempt under New York's civil service system, the Civil Service Commission[4] considers criteria such as "the confidential nature of the position,

the performance of duties which require the exercise of authority or discretion at a high level, or the need to have expertise or personal qualities which cannot be measured by a competitive exam." *Savage,* 850 F.2d at 69.[5] At the time of plaintiff's termination, 54 of the DEC's 3,954 employees were exempt. Thus, plaintiff's exempt status, though not dispositive, weighs in defendants' favor. *See McDermott v. Pataki,* 1996 WL 596570 at *1 (N.D.N.Y.) (Pooler, J.); *Vona v. County of Niagara,* 1995 WL 222049 at *7 (W.D.N.Y.).

Second, defendants do not address whether the Special Assistant position required technical expertise. Plaintiff asserts that she possessed professional, rather than technical, expertise. The parties not having developed the issue, however, the Court declines to consider this factor.

Third, there is no evidence in the record that plaintiff controlled others. Plaintiff affirmatively asserts that as Special Assistant, she had no supervisory authority with respect to any employees in the DEC or LFLU. (Catone Aff. ¶ 37). Nor could plaintiff make personnel decisions or assign tasks to other employees. (*Id.*) Former DEC Commissioner Langdon Marsh and former DEC General Counsel Marc Gerstman testify to the same effect. (Marsh Aff. ¶ 20; Gerstman Aff. ¶ 9). This factor thus weighs in plaintiff's favor.

Fourth, plaintiff argues that she was not authorized to speak on behalf of policymakers. Specifically, plaintiff asserts that "[a]t

---

4. The New York Civil Service Commission is responsible for administration of the civil service system. N.Y. Civ. Serv. L. § 6 (McKinney 1987).

5. It is more than mere fortuity that this analysis mirrors the *Vezzetti* factors. *See Savage,* 850 F.2d at 69. Moreover, as the Second Circuit noted in *Savage,* the state's civil service classification is entitled to considerable deference:

> Both the interests of federalism and the conservation of judicial resources would ordinarily be better served by the federal courts' giving substantial deference to the state's judgment where government positions are so defined. Otherwise, federal courts will be embroiled in determining at each change of state or local administration which positions are appropriately within the political patronage system. Such a determination not only creates the pos-

sibility of a super-civil service overseen by the courts, but allows the federal judiciary to intrude undesirably into the very structure of state and local governments.

*Id.* Despite this "substantial deference," plaintiff's exempt status is not dispositive, and the remaining factors must be considered. *Regan,* 984 F.2d at 580; *cf. Stott v. Haworth,* 916 F.2d 134, 142 (4th Cir.1990) (holding that exempt status under civil service law creates presumption that discharge for political affiliation is permissible).

Similarly, the Court considers the fact that plaintiff's position was designated as "policymaking" for the purposes of financial disclosure pursuant to the New York Public Officers Law, § 73–a.1.(c) (*See* Spielmann Aff. Ex 3). It is worth noting, however, that the determination apparently was made on February 24, 1995, two weeks before plaintiff was let go. (*Id.*).

no time during her employment with the DEC was Plaintiff authorized to speak for the DEC, the Governor, or the Commissioner in the development of federal legislative policy." (Pl. Mem. in Opp. at 15). Marsh corroborates this assertion as well. (Marsh Aff. ¶ 18). Furthermore, while plaintiff's job description includes the responsibility to prepare and deliver testimony, it includes no indication that plaintiff herself would be expected to deliver such testimony.[6] (*See* Spielmann Aff. Ex. 4).

Defendants refer to a number of exhibits, however, that are arguably probative on whether plaintiff was authorized to speak on behalf of policymakers. For example, a number of plaintiff's travel vouchers indicate that she alone represented the DEC in a negotiating capacity on several occasions. (*See, e.g.,* Spielmann Aff. Ex. 19 (travel voucher dated 1/5/94 stating that purpose of travel was "[t]o represent NYS at a National Governors' Association legislation strategy meeting"); (Gerstman memo dated 6/28/94 stating that purpose of plaintiff's travel was "to participate in negotiations on interstate waste legislation in the House of Representatives"); Spielmann Aff. Ex. 21 (Gerstman memo dated 4/17/92 stating that purpose of plaintiff's travel was "[t]o meet with Congress members Manton and Swift and staff to present New York's position on Solid Waste and RCRA issues"); (Marsh Memo dated 4/2/92 stating that plaintiff "traveled to Washington, DC to take [Marsh's] place in briefing Jim Matthews of Congressman Manton's office ... [plaintiff] was asked and agreed to represent the Department at the last minute ...."). In many of these instances, plaintiff seems to have been the only DEC employee attending the meeting. (*See generally* Spielmann Aff. Ex 19).[7]

Fifth, as plaintiff avers, little in the record reveals whether she was perceived as a policy maker by the public.

Sixth, defendants make much of what they argue was plaintiff's influence over government programs. In particular, defendants point to plaintiff's own resume, in which she states that her duties with DEC involved (1) formulating strategy for environmental legislation pending before Congress; (2) advising DEC Executive Staff, preparing policy presentations to legislators; (3) identifying opportunities for media support; (4) negotiating aspects of legislation and major environmental reauthorization. (*See* Spielmann Aff. ¶ 25). Defendants also refer to a host of exhibits including memoranda, correspondence and "daybook" files reflecting what defendants argue was plaintiff's significant involvement in drafting proposed legislation, assisting members of Congress and local officials in drafting legislation of concern to the DEC, and advising senior DEC personnel on such legislation. (*See generally* Spielmann Aff. Ex 6–18). Of course, to the extent such documents reflect the actual duties plaintiff performed, they are informative, but not determinative, of the extent of plaintiff's influence. *See Waskovich v. Morgano,* 2 F.3d 1292, 1300 (3d Cir.1993); *see also Gordon,* 110 F.3d at 889; *Regan,* 984 F.2d at 580–81.

Nonetheless, plaintiff's job description illustrates that some of the duties reflected in these documents were inherent in plaintiff's position as Special Assistant. Though plaintiff's job description speaks in somewhat general terms of her role, several of the duties are consistent with those of someone who "acts as an advisor or formulates plans for

---

**6.** Under the heading "Preparation and Delivery of Testimony," plaintiff's job description lists the following responsibilities:
— Notify Commissioner and/or Executive Deputy Commissioner of all requests for DEC representation at Congressional hearings.
— Coordinate preparation, review and approval of testimony, scheduling internal meetings as necessary to resolve concerns and/or policy differences among divisions.
— Oversee final packaging of testimony and distribution to New York's Washington Office and Congressional committees.

(Spielmann Aff. Ex. 4).

**7.** Gerstman asserts in his affidavit that "[u]nder no circumstance was [plaintiff] authorized to travel to Washington, D.C. unaccompanied by a senior DEC staff member and/or member of the New York State Office of Federal Affairs located in Washington, D.C.". (Gerstman Aff. ¶ 29). Thus, it is unclear whether plaintiff alone ever represented the DEC or spoke on behalf of policymakers.

the implementation of broad goals." *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687. Such duties included, inter alia: (1) coordinating development of Statewide positions when legislation affects more than one state agency; (2) helping to review and approve correspondence directed to members of Congress concerning DEC positions on environmental legislation or other Federal affairs; and (3) assisting Senior LFLU staff in planning annual policy statements on major environmental legislation, and assisting the Governor's office in representing New York State on multi-state organizations such as the National Governors' Association and the Environmental Council of the States. (Spielmann Aff. Ex. 4).

Moreover, a number of specific documents may be construed as illustrating the extent to which plaintiff exercised her own judgement and discretion in an advisory capacity. In a March 23, 1994 memo to then-Commissioner Marsh, plaintiff noted, in regard to a meeting concerning certain legislation, that "[a]mendments were discussed and tentatively approved, and these amendments are—in my judgment—realistic and certainly represent the basis for further negotiations ...". (Spielmann Aff. Ex. 6, Memo of 5/23/94).

As to the last factor, defendants fail to establish that plaintiff was responsive to partisan politics or political leaders. Other than plaintiff's admission that she was a Cuomo supporter, defendants present no evidence that plaintiff was actively partisan in the exercise of her duties.

This failure is significant because it underscores an important defect in defendants' motion; defendants' analysis of the *Vezzetti* factors takes place in a vacuum, with endless and exhaustive citations to specific language in internal DEC documents from which the Court is invited to infer that plaintiff had day-to-day responsibilities as a "policymaker." Defendants have ignored a crucial conceptual step, having shown the Court the trees, but not the forest: the *Vezzetti* factors in and of themselves are but the means toward a broader determination, namely that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at

518, 100 S.Ct. at 1295. While some factors may tilt in defendants' favor, defendants have failed to establish, as a matter of law, that there existed in plaintiff's case a "rational connection between shared ideology and job performance." *Gordon,* 110 F.3d at 889 (quoting *Savage,* 850 F.2d at 68 (2d Cir. 1988)). In fact, defendants' papers are devoid of any such discussion.

■ This is not to say, of course, that the evidence set forth by defendants sheds no light on the nature of plaintiff's position. On the contrary: based upon the record, plaintiff may well have been a policy maker. That conclusion, however, hardly is indisputable on the facts presented. Defendants bear the substantial burden of showing that political affiliation is an appropriate requirement for plaintiff's position, and any doubts should be resolved in plaintiff's favor. *See Elrod,* 427 U.S. at 369, 96 S.Ct. at 2687–88; *McDermott,* 1996 WL 596570 at *2; *Vona v. County of Niagara,* 1995 WL 222049 at * 6 (W.D.N.Y. 1995). Such requirements comport with summary judgment analysis generally, *see Heyman,* 524 F.2d at 1317; *Ramseur,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway,* 762 F.2d at 249, and are particularly apt where the government seeks "to validate an encroachment on protected interests". *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687. And though the "policy maker" question is a matter of law, *see Gordon,* 110 F.3d at 888–89, the determination is fact intensive. *See Flynn v. Menino,* 944 F.Supp. 81, 87 (D.Mass.1996). Moreover, the Court is asked on the present motion to draw specific and discrete inferences from documents that are subject to varying interpretations.

■ In sum, defendants have failed to establish the absence of a factual issue as to whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295. Thus, defendants motion for summary judgment is denied as to plaintiff's First Amendment claim.

**(b) Qualified Immunity**

The preceding discussion, however, makes clear that Spielmann is entitled to qualified

immunity on plaintiff's First Amendment claim.

"[G]overnment officials performing discretionary functions ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Three factors are utilized by courts in this circuit to determine whether a right was clearly established: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). Qualified immunity also will protect a defendant, even where the right was clearly established, if it was objectively reasonable for the defendant to believe the acts did not violate that right. *See Benitez v. Wolff,* 985 F.2d 662 (2d Cir.1993).

The Court's discussion of plaintiff's questionable status as a policy maker compels the conclusion that Spielmann is entitled to qualified immunity, since reasonable officials could disagree over plaintiff's status as a policy maker. *See McDermott,* 1996 WL 596570 at *5.

> 'While *Elrod* and *Branti* developed a useful framework for assessing the constitutionality of patronage dismissals, it cannot be said that these decisions clearly established the law with respect to every governmental position. Following *Branti,* the courts have proceeded on a case by case basis to enumerate the permissible and impermissible instances of politically motivated employment decisions; however, the *Branti* guidelines do not lend themselves to easy or automatic application.'

*Id.* (quoting *Hawkins v. Steingut,* 829 F.2d 317, 320 (2d Cir.1987)). As discussed above, several of the *Vezzetti* factors arguably militate in favor of a finding that plaintiff was a policy maker. And while that conclusion is not legally mandated on the facts presented, the Court cannot say that such a conclusion is unreasonable. Since Spielmann may reasonably have concluded that plaintiff was a policy maker, he is entitled to qualified immunity in his individual capacity.

For these reasons, defendants' motion for summary judgment is granted as to defendant Spielmann on plaintiff's First Amendment claim.

## (2) Plaintiff's Due Process Claim

Where a public employee is found to have a property interest in continued employment, the Fourteenth Amendment's due process clause forbids discharge absent a pre-termination hearing. *O'Neill v. City of Auburn,* 23 F.3d 685, 688 (2d Cir. 1994); *Dwyer v. Regan,* 777 F.2d 825, 831 (2d Cir.1985), *modified,* 793 F.2d 457 (2d Cir. 1986). "Property interests ... 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'". *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Specifically, "[t]his circuit looks to New York Civil Service Law and the statutes which create a particular position or the authority to appoint or remove an individual to or from the position to determine whether a New York public employee has a property interest in his position requiring that he be afforded a hearing before termination." *Todaro v. Norat,* 112 F.3d 598, 1997 WL 219423, *1 (2d Cir.1997).

Section 75(1)(b) of the New York Civil Service Law provides, in pertinent part, as follows:

> 1. Removal and other disciplinary action. A person described in ... paragraph (b) ... shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.

*         *         *         *         *         *

(b) a person holding a position by permanent appointment ... who was honorably discharged or released under honorable circumstances from the armed forces of the United States having served therein as such member in time of war ... except when a person described in this paragraph holds the position of private secretary, cashier or deputy of any official or department ...

N.Y. Civ. Serv. L. § 75(1)(b) (McKinney 1983 and Supp.1997). In *O'Neill,* the Second Circuit reaffirmed prior decisions holding that § 75 creates a property interest for covered employees, such that they may not be terminated absent notice and a hearing.[8] *See O'Neill,* 23 F.3d at 688 (citing *Dwyer,* 777 F.2d 825; *Berns v. Civil Service Comm'n,* 537 F.2d 714, 716 (2d Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977)).

It is undisputed that plaintiff was honorably discharged from the Air Force after service during the Vietnam War. (Catone Aff. Ex. A). It is further undisputed that she was terminated with neither notice nor a hearing. (Def. Mem. in Support at 3). In support of their motion for summary judgment, however, defendants argue that plaintiff was a "deputy" within the meaning of § 75(1)(b), thus excluding her from the protections otherwise afforded veterans by the same provision.

### (a) Was Plaintiff a Deputy?

■ A deputy under § 75 is one who is designated, appointed or deputed to act for another. *Sullivan v. Superintendent of Insurance,* 103 A.D.2d 914, 478 N.Y.S.2d 153, 154 (3d Dep't 1984), *aff'd,* 64 N.Y.2d 1074, 489 N.Y.S.2d 904, 479 N.E.2d 249 (1985). Deputyship is not a matter of a specific title, nor must the position be named in a statute; "[t]here must, however, be a statute authorizing the purported deputy to 'take over and perform the duties vested in the principal officer or ... a statute authorizing the principal officer to delegate his duties and thus to create a deputyship.'" *Id.; see also Tranello v. Frey,* 758 F.Supp. 841, 852 (W.D.N.Y. 1991), *aff'd in part, appeal dismissed in part,* 962 F.2d 244 (2d Cir.) ("'An appointee's status as deputy is determined not by what the appointee in fact does but by what he is directed or authorized to do by statute, i.e. whether there is a statute authorizing the principal officer to delegate his duties to the subordinate.'"), *cert. denied,* 506 U.S. 1034, 113 S.Ct. 813, 121 L.Ed.2d 686 (1992) (quoting *Clarke v. O'Brien,* 91 Misc.2d 190, 397 N.Y.S.2d 509, 511 (Sup.Ct. Suffolk County 1975), *aff'd,* 56 A.D.2d 869, 392 N.Y.S.2d 383 (2d Dep't 1977)). Once it is determined that the principal had statutory authority to create a deputyship, the Court then examines whether the principal has invested the employee with sufficient administrative powers such that the employee is a deputy in the exercise of administrative functions. *Sullivan,* 478 N.Y.S.2d at 154.

■ Section 3–0107(2) of New York's Environmental Conservation Law empowers the DEC Commissioner to "appoint such deputies, directors, assistants and other officers and employees as may be needed for the performance of his duties and may prescribe their powers and duties[.]" In *Sullivan,* the

---

**8.** Defendants argue that even if plaintiff suffered a deprivation of property, such deprivation was not without due process, since she had an adequate state remedy under article 78 of the C.P.L.R. The decision relied upon by defendants, *Todaro v. Norat,* 920 F.Supp. 66, 67 (S.D.N.Y. 1996), recently was vacated by the Second Circuit. *See Todaro v. Norat,* 112 F.3d 598, 1997 WL 219423 (2d Cir.).

The district court's decision that a post-termination hearing under Article 78 was constitutionally adequate directly conflicts with the holding of *Cleveland Bd. of Educ. v. Loudermill,* ... which requires a government entity to give its tenured employee notice and an opportunity to respond before he is terminated from

a public position. Due process does not require a full, judicial-type hearing before employment is terminated, but certain features must be present to fulfill the minimum requirements of fairness: the employee must be given oral or written notice of the charges against him, an explanation of the employer's evidence, and the opportunity to present his side of the story. A post-termination proceeding such as that provided under Article 78 does not meet the *Loudermill* requirements because it takes place after the employee has lost his job. *Id.,* 112 F.3d at 599–600 (internal citations omitted). Thus, defendants argument that plaintiff had recourse to due process in an article 78 proceeding is unavailing.

Third Department found that former sections 10, 11 and 16 of the Insurance Law (now sections 201 and 202) [9] vested the Superintendent of Insurance with sufficient statutory authority to delegate his duties and create a deputyship. *Sullivan,* 478 N.Y.S.2d at 154. The Court is compelled to reach a similar conclusion with respect to § 3–0107(2).

Since the Commissioner had the statutory authority to create a deputyship, the ultimate inquiry is whether plaintiff was "invested with sufficient administrative powers so as to constitute [her] a deputy in the exercise of administrative functions." *Sullivan,* 478 N.Y.S.2d at 154. As plaintiff points out, while § 3–0107(2) may vest the DEC Commissioner with sufficient authority to create a deputyship, defendants present no evidence that the Commissioner in fact did so in plaintiff's case.[10] Marsh avers in his affidavit that he "never explicitly or by implication, in theory or practice, authorized Catone to take over or perform any of [his] job duties or responsibilities, or any part thereof[.]"

■ The Court finds the Third Department's language in *Sullivan* persuasive on the question of whether plaintiff was a deputy in the present case:

> Our review of the[ ] job descriptions and other materials in the record convinces us that a question of fact exists on this issue. Petitioner's position involved coordinating consumer activities, developing programs and attending meetings as directed by the [Superintendent of Insurance], and also representing [him] at certain meetings and committees. The position also required extensive research and preparation of tes-

timony, in addition to the tracking of state and federal legislation. These varied duties do not permit simple assessments with regard to the exercise of [the Superintendent's] administrative powers. Although petitioner was empowered to represent [the Superintendent] before various public and private organizations and committees, it is unclear for the record to what extent petitioner was authorized to so represent [him].

*Id.* 478 N.Y.S.2d at 155. Catone's duties were no less varied, and the assessment of whether she was a deputy cannot be gleaned as a matter of law from defendants' submissions, particularly since defendants submit no evidence of what duties of the Commissioner's, if any, were delegated to plaintiff. For these reasons, summary judgment must be denied as to plaintiff's due process claim.

**(b) Qualified Immunity**

Defendants argue that "there is no doubt in this matter that plaintiff was a policymaker and functioned as a deputy ... [and that] [i]t was clearly reasonable on the facts of this case for defendant Spielmann to believe that he was not violating plaintiff's rights as a veteran."

The Second Circuit iterated in *O'Neill* that § 75 affords covered employees a property right such that they may not be terminated absent notice and a hearing. *Id.* at 688; *see also Dwyer,* 777 F.2d 825; *Berns,* 537 F.2d at 716. Not only would a reasonable official have known of these rights, Spielmann himself in fact knew of these rights as well as

---

9. New § 202 consolidated the provisions of those contained in former §§ 11 and 16 and provides, in pertinent part, that

 (a) The superintendent shall appoint a first deputy superintendent and may appoint additional deputies as provided for by law. The superintendent may remove at will any deputy appointed by him, except as may be otherwise provided by the civil service law.

 (b) The superintendent may appoint and remove from time to time, in accordance with law and any applicable rules of the state civil service commission, such employees as he may deem necessary for the efficient administration of the department

 \*    \*    \*    \*    \*    \*

N.Y. Ins. L. § 202 (McKinney 1985).

10. Defendants argue that "[p]ursuant to [§ 3–0107(2)] the position of Special Assistant to the General Counsel for federal legislation was created. As set forth in Point I, plaintiff was delegated authority in the area of federal legislation and policy." (Def. Mem. in Support at 14). Thus, defendants rely largely on the same arguments and evidence they proffer with respect to the question of whether plaintiff was a policy maker. Those arguments are no more persuasive on the question of whether plaintiff was a deputy within the meaning of § 75(1)(b).

plaintiff's protected status because of them. (Spielmann Dep. at 100). Defendants do not seem to dispute this. Essentially, they argue that a reasonable official would have understood plaintiff to be a deputy, and thus would have reasonably believed plaintiff's termination was not in violation of § 75.

Defendants fail to specify, however, what facts in the record would lead a reasonable official to believe that he was not violating plaintiff's rights under § 75. Defendants rely on the same voluminous documents submitted in support of their contention that plaintiff was a policy maker, without pointing out how such documents reflect a deputyship. There is no objective indication that plaintiff was delegated any of the Commissioner's duties, or that a reasonable official would have understood such delegation to constitute plaintiff a deputy in the exercise of administrative powers.

█ Essentially, defendants foist their hopes on blurring the distinction between a policy maker and a deputy. The analysis for each question is different however, despite defendants' conclusory assertions to the contrary. (*See, e.g.,* Def. Mem. in Support at 20) ("It was reasonable for defendant Spielmann to conclude that plaintiff, was a policymaking deputy and could be terminated without a hearing."). The Court simply cannot say, as a matter of law, that a reasonable official would have believed that plaintiff was a deputy within the meaning of § 75.

Thus, defendants' motion for summary judgment based upon the qualified immunity of defendant Spielmann must be denied as to plaintiff's due process claim.

### III. CONCLUSION:

For all of the foregoing reasons, then, it is hereby

**ORDERED**, that defendants' motion for summary judgment is **GRANTED** as to defendant Spielmann in his individual capacity on plaintiff's First Amendment claim; the motion is DENIED in all other respects. **IT IS SO ORDERED.**