Janet PASCAL,

v.

STORAGE TECHNOLOGY CORP.

No. 3:99CV713 (JBA).

United States District Court, D. Connecticut.

Feb. 15, 2001.

194

Francis J. Grady, Angelo Maragos, Dana B. Lee, Grady & Riley, Waterbury, CT, for Janet Pascal.

Michael L. Banks, Ian M. Ballard, Jr., Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Storage Technology Corp.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

Plaintiff Janet Pascal claims that her former employer, Storage Technology Corp. ("StorageTek"), subjected her to a hostile work environment and discriminated against her on the basis of her sex and age and then retaliated against her for complaining about this treatment, by reassigning her accounts to younger male representatives, putting her on a Performance Improvement Plan ("PIP") and then terminating her on January 13, 1998 after she failed to meet her sales quota. Defendant has moved for summary judgment on all counts [Doc. # 31]. For the reasons set forth below, defendant's motion is granted in part and denied in part.

## I. Factual Background

Ms. Pascal began working for StorageTek in its Hartford office as a marketing representative consultant, or "sales rep," in April 1994. She was recruited from IBM by Joel Kimball to increase StorageTek's sales business with Cigna, one of Pascal's clients at IBM. Def.'s Statement of Undisputed Facts, ¶¶ 2–4. Plaintiff was forty-two years old when she was hired.

From January 1997 until her termination in January 1998, plaintiff's immediate supervisor was Steve Gordon; Joel Kimball was his superior, and also had supervisory authority over plaintiff. Steve Gordon had responsibility for interviewing and hiring sales representatives for the Boston and Hartford offices in 1997. Deposition of Steve Gordon at 16. In 1998, he had responsibility for hiring sales representatives for large accounts in both offices. *Id.* Kimball participated in decisions to remove major accounts from sales reps. Deposition of Joel Kimball at 49.

According to plaintiff, Gordon took two of her sales accounts away from her in 1997 and told her that he was giving them to male representatives so they could go out drinking with the customers. Plaintiff also contends that the work environment at StorageTek was sexually hostile, and that StorageTek did nothing to remedy the problem after her complaints. In September 1997, plaintiff complained to Linda Williams, from StorageTek's Human Resources Department, about the discriminatory treatment and the hostile environment at StorageTek. Following

this meeting with Williams, plaintiff was informed by Gordon and Kimball that she would be put on a performance improvement plan ("PIP"), which required her to meet 100% of her year-to-date quota within 60 days or risk termination. Subsequently, plaintiff failed to meet her quota and she was terminated by Gordon on January 13, 1998, effective February 12, 1998. Defendant claims that these decisions were based on customer complaints about her performance and her failure to meet her quota. Plaintiff, in turn, maintains that the decisions are based on sex and age discrimination and retaliation for her complaints.[1]

## II. Discussion

### A. *Summary Judgment Standard*

Summary judgment may be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party bears the initial burden of establishing that no genuine issues of material fact exist and that the undisputed facts show that he is entitled to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060 (2d Cir.1995). A party seeking to avoid summary judgment cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (*quoting Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, all ambiguities are to be resolved against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988).

In *Weinstock v. Columbia University,* the Second Circuit emphasized that "[s]ummary judgment is appropriate even in discrimination cases," noting that "[t]he Supreme Court has also recently reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." 224 F.3d 33, 41 (2d Cir.2000) (*citing Reeves v. Sanderson Plumbing,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)). However, "[a]s discrimination will seldom manifest itself overtly, courts must be alert to the fact that employers are rarely so cooperative as to include a notation the personnel file that the firing or failure to promote is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999) (*citing Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464–65 (2d. Cir.1989)). Thus, courts must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. *See id.* This determination should not be made through guesswork or theorization. *See id.* "After all, an inference is not a suspicion or a

---

1. Plaintiff's Complaint alleges violations of Title VII and the ADEA, as well as Connecticut's Fair Employment Practices Act. Claims of sex discrimination, age discrimination and retaliation in employment under FEPA are adjudicated using the same standards as are applied to cases arising under Title VII and the ADEA. *See Miko v. CHRO,* 220 Conn. 192, 204, 596 A.2d 396 (1991); *Levy v. CHRO,* 236 Conn. 96, 107–08, 671 A.2d 349 (1996). The discussion below applies plaintiff's state and federal discrimination claims, as defendant has moved for summary judgment on all counts.

guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id.* (citation omitted). Viewing the evidence as a whole and taking into account all of the circumstances, the Court must determine whether the evidence can reasonably and logically give rise to an inference of discrimination. *See id.*

## B. *Sex Discrimination Claims*

StorageTek argues that it is entitled to summary judgment on plaintiff's sex discrimination claims because Pascal fails to make out a prima facie case and, in the alternative, because she has not shown that its legitimate nondiscriminatory reasons are pretextual and that sex discrimination was a motivating factor. For the reasons set forth below, plaintiff has both met her prima facie case and set forth sufficient evidence of pretext to survive summary judgment on these claims.

■ Under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to establish a prima facie case of discrimination under Title VII, the plaintiff must show (1) that she is a member of a protected class; (2) that she was qualified for her job; and (3) that she suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Norville v. Staten Island Hosp.,* 196 F.3d 89, 95 (2d Cir. 1999). "To make the required showing, a plaintiff may rely on direct evidence of what the defendant did and said, but more often than not must depend on the cumulative weight of circumstantial evidence to make out a prima facie case." *Tarshis v. The Riese Org.,* 211 F.3d 30, 35–36 (2d Cir.2000) (*citing Luciano v. Olsten Corp.,*

110 F.3d 210, 215 (2d Cir.1997)). The burden on the plaintiff in proving a prima facie case is not onerous. *See Tarshis,* 211 F.3d at 35. The plaintiff simply must submit evidence demonstrating circumstances that would permit a rational fact-finder to infer a discriminatory motive. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir.1996).

Proof of the prima facie case creates a presumption of discrimination that defendant may rebut by producing evidence of a legitimate nondiscriminatory reason for the adverse employment decision. *See St. Mary's Honor Center,* 509 U.S. at 507, 113 S.Ct. 2742. After defendant meets its burden, the plaintiff may prevail only if she proves that the reasons given by the defendant are pretextual and that discrimination was a motivating factor in the decision. *See id.*

■ "In determining the appropriateness of summary judgment [in a discrimination case], the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole." *Howley v. Town of Stratford,* 217 F.3d 141, 151 (2d Cir.2000).

### 1. *Prima facie case*

Here, plaintiff claims that StorageTek discriminated against her on the basis of her sex when it took away the Hartford Steam Boiler account in August 1997, the Cigna account in September 1997, put her on a PIP in October 1997 and finally terminated her in January 1998. Defendant vigorously disputes whether any of these actions were taken under circumstances that give rise to an inference of discrimination.

The Hartford Steam Boiler account was taken away from plaintiff by Gordon in August 1997. *See* Pascal dep. at 113–14; Pascal Aff. ¶ 12. According to plaintiff, when Gordon took away the account he told her that the Hartford Steam Boiler contact wanted a man (Dan Beal) assigned to the account. The account was re-assigned from plaintiff to Michael Kearney. *See* Pascal dep. at 114. Gordon allegedly told her "that he wanted to assign the account to a guy because he thought that the guy would be able to take Ed [the Hartford Steam Boiler contact] out drinking. And that it would be better if it were handled by a male. And then he left me a phone mail that explained that he wanted to give it to a guy, but he didn't think that Ed was afraid of females. He didn't think he was gay or anything. But [he] definitely told me that he was assigning it to a guy because he thought that they could take him out drinking." *Id.* at 115. When plaintiff protested the reassignment, Gordon told her that he was giving the account to a male rep "because the customer requested it." *Id.* at 116.

Defendant argues that the Hartford Steam Boiler was a very minor account, and points to the fact that plaintiff made only one call to Hartford Steam Boiler in 1997 as evidence that the transfer was not the cause of plaintiff's failure to meet her quota in 1997. *See* Kimball dep. at 50. Defendant also argues that because all the other sales reps are men, if it were to replace plaintiff, it would necessarily be with a male representative, and therefore the fact that Michael Kierney was assigned to the account cannot give rise to an inference of discrimination. At oral argument, however, defendant conceded that there were disputed facts regarding the reasons given to plaintiff by Gordon for the transfer.

According to plaintiff, on Friday, September 12, 1997 she was told by Steve Gordon that "he was taking Cigna because he wanted to give it to a guy, because he wanted to have someone that could rub elbows with Joe Morley [from Cigna] and take him out for beers." Pascal dep. at 138; *id.* at 158. Although she again protested, Gordon told her they were giving the account to Steve Candela. *Id.* On Monday September 15, however, Kimball informed plaintiff that there had been a mistake and they were not going to take Cigna from her. *Id.* at 139. It is undisputed that the Cigna account was not in fact transferred to a male representative, and that plaintiff remained responsible for Cigna after September 15, 1997.

On October 2, 1997, following the incident with the Cigna account and plaintiff's subsequent complaints to StorageTek human resources personnel, plaintiff was placed on a performance improvement plan (PIP) by Kimball and Gordon. Pascal dep. at 162–63; *see also* Letter from Kimball to Pascal dated 10/2/97· re: Improvement Plan, Pl.'s Ex. N. StorageTek claims that it put plaintiff on the PIP because of complaints from Cigna and her failure to meet her sales quota for three consecutive years. The PIP stated that StorageTek expected the following from plaintiff:

Increase performance against YTD quota to 100% and must be on track to achieve all Master Club qualifications per the 1997 Marketing Representative Compensation Plan.

Take stronger ownership of new business areas. Demonstrate by increasing sales and account management activities in GPG. The objective is to create a positive STK product approach to the account and alleviate complaints of from [sic] the Product staff.

Work to improve your interpersonal skills with customer management.

PIP, Ex. N. The PIP also stated that "[w]e are expecting improvement within the next 30 days and successful completion of the plan in 60 days," and that Gordon would conduct weekly status reviews with her on her progress. *Id.* Because plaintiff again failed to meet her quota in 1997, she did not meet her PIP; she was subsequently terminated in early 1998.

Plaintiff challenges the weight given to the alleged Cigna complaints, and argues that the initial decision to put her on the PIP based on her alleged failure to meet quota was discriminatory and that the sales numbers of various male reps were inflated to allow them to meet quota, while hers were not. Because this evidence is also addressed as rebuttal to defendant's expressed legitimate nondiscriminatory reasons for its decisions—poor performance—it is only summarized briefly here, and is discussed in greater detail below. She points to evidence of the discriminatory preference expressed by Gordon for male sales reps as further demonstrating Gordon's discriminatory intent in putting her on the PIP and terminating her. Finally, she offers evidence suggesting that similarly-situated male reps were not treated as harshly as she was.

■■■ Plaintiff points to Frank Kierney as an example of a male sales representative who failed to meet his quota for three years and yet was not placed on a PIP. In order for employees to be "similarly situated" for the purposes of establishing a plaintiff's prima facie case, they "must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's...." *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir.1999). The Second Circuit has recently held that "the standard for comparing conduct requires a reasonably close resemblance of the facts and circum-

stances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000). The relevant inquiry looks to "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.*

Like plaintiff, in September 1997, Kierney had not met his quota for the preceding three years. Although plaintiff does not allege that customers had complained about Kierney, plaintiff is not required to identify an identically-situated employee, and plaintiff has offered evidence disputing the extent to which defendant relied on the alleged complaints from Cigna and showing that other decision makers at Cigna thought highly of her work. Therefore, a reasonable jury could conclude that Kierney's conduct was of comparable seriousness. Defendant also argues that Kierney was a sales manager rather than a sales rep for the first few months of 1994, and therefore did not have a compensation plan for a large part of the year. Plaintiff counters that as she was not hired until April 1994, she is similarly situated. In the absence of further explanation from defendant about whether the quota totals for either Pascal or Kierney in 1994 were yearly or pro-rated to reflect that they made sales for only part of the year, Kierney's status as a sales manager in the beginning of 1994 does not defeat the inference of discrimination created by defendant's differential treatment of Kierney. Defendant's attempts to distinguish Kierney only illustrate the disputed facts requiring jury resolution. *See Graham,* 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury.").

Defendant also argues that plaintiff's termination does not give rise to an inference of discrimination because she has not shown that any similarly-situated male employee who failed to meet his quota for four consecutive years, had customer complaints about his performance and had not met the terms of a PIP, was not terminated. However, immediately after plaintiff's termination, two male sales reps, Jeremy Lombardo and Michael Mussulli, were hired to the Waltham office. *See* Pl.'s Sur-reply, Ex. A. Although plaintiff does not dispute that she failed to meet her quota for four consecutive years, she offers evidence from which a reasonable jury could conclude that her termination took place under circumstances giving rise to an inference of discrimination. Plaintiff contends that Michael Kierney, Frank Kierney's son, did not make his quota for his first five years, 1991–1995, and was not terminated. *See* Pl.'s Exs. J, V.

Although Kimball did not become sales manager of the East Hartford office until 1994, when he became manager, Michael Kierney had already failed to make quota for 3 years, and continued to do so for two additional years, during the same period in which plaintiff also did not make quota. Kimball therefore had supervisory authority over both Kierney and plaintiff. It is undisputed that Kierney and plaintiff were both sales representatives and both failed to meet quota. Under these circumstances, a jury could find that Kierney and plaintiff are similarly-situated because they "were subject to the same workplace standards," and engaged in conduct "of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir.2000).

■ The fact that Kierney was not terminated after failing to meet quota for five years is evidence that defendant did not have a policy that anyone who failed to meet quota for four years would be terminated. StorageTek claims that Jim Tague, a male rep, failed to meet the terms of his PIP and was terminated after failing to meet quota for only three years. These decisions indicate, at a minimum, that StorageTek exercised discretion in determining the weight to give to the failure to meet quota. Given this discretion, particularly in light of evidence that plaintiff's supervisor had previously expressed a discriminatory preference for male reps, plaintiff has offered sufficient evidence to support an inference that her termination was motivated at least in part by sex discrimination. Thus, whether Kierney is indeed similarly situated because he engaged in conduct of comparable seriousness requires resolution by the jury.

Given the de minimus burden required to make out a prima facie case, and bearing in mind the Second Circuit's admonition that "in determining the appropriateness of summary judgment, the Court should not consider the record solely in a piecemeal fashion," plaintiff has offered sufficient evidence from which a reasonable jury could conclude that defendant's actions against her occurred under circumstances giving rise to an inference of sex discrimination. *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir.2000).

*2. Pretext*

Defendant claims that all the actions plaintiff complains of were taken because of customer complaints and her poor sales performance. The burden therefore shifts to plaintiff to provide evidence suggesting that these reasons are pretextual and that sex discrimination was a motivating factor in defendant's decisions.

According to defendant, the Hartford Steam Boiler and Cigna accounts were reassigned because of customer complaints. However plaintiff contends that she was told by Gordon that the Hartford

Steam Boiler client wanted a male representative, and that Gordon expressly stated that he wanted a man to go out drinking with the client. A similar conversation allegedly occurred with respect to the Cigna account. To rebut defendant's legitimate nondiscriminatory reason, "[p]laintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). Although the summary judgment record is not clear on the issue, if the customer complaints defendant allege prompted the removals were discriminatory customer preferences for male sales reps, defendant's actions would not be shielded by Title VII. *See Feder v. Bristol–Myers Squibb Co.*, 33 F.Supp.2d 319, 333 (S.D.N.Y.1999) ("one cannot justify otherwise unlawful discrimination on the ground that one's customers do not like to deal with members of a protected class"). Although defendant denies that Gordon made the statements plaintiff alleges, that dispute requires resolution by the jury. Plaintiff's evidence of Gordon's explicit discriminatory statements thus sufficiently rebuts defendant's asserted legitimate, nondiscriminatory reason to present a genuine issue of material fact.

As noted above, defendant claims that plaintiff was put on the PIP and terminated due to performance problems, including complaints from Bob Radley at Cigna and her failure to meet her quota. However, drawing all inferences in plaintiff's favor, her evidence is sufficient to cast doubt on the reliability of quotas, and as to whether defendant was even aware that she had failed to meet the terms of her PIP when she was terminated. In addition, plaintiff has offered evidence that suggests that at least some of the decision makers at Cigna

thought plaintiff was doing an excellent job, that her Cigna sales numbers were good and that Cigna purchases from StorageTek decreased after her termination. Plaintiff's evidence of express discriminatory statements by her supervisor Gordon, her subsequent protests, and the decision to put her on the PIP, permits an inference that sex discrimination was a motivating factor in the PIP decision, and that StorageTek's decision to put her on the PIP was the first step in an attempt to document failings that would allow Gordon to achieve his goal of replacing plaintiff with male representatives and led to plaintiff's eventual termination.

According to plaintiff, at her review in February 1997, no mention was made of any performance problems, and prior to September 1997, Gordon and Kimball had not mentioned any complaints of her poor performance. Pascal aff. ¶ 17. Although her February 1997 review does mention that she "needs to change tactics in 1997 in her approach to quota," it also states unequivocally that "Janet's teamwork is strong, she communicates very, very well with management and sales team members." Def.'s Ex. 5. In addition, when plaintiff met with Linda Williams from human resources on September 15, 1997, after the incident regarding the Cigna account, plaintiff claims that Williams acted surprised when plaintiff told her what had happened and said "the only things I have ever heard about you have been good, and I'm surprised that this is happening." Pascal dep. at 140.

Moreover, according to the affidavit of Jean Fradet, former director of Financial Services at Cigna, plaintiff's work with Cigna was excellent. Fradet considered "Ms. Pascal a highly effective and professional salesperson. Ms. Pascal demonstrated a thorough understanding and command of Storage Technology's product

lines and the ability to effectively communicate information about complex computer systems. Throughout her tenure at IBM and Storage Technology Corporation, Ms. Pascal consistently showed an awareness of Cigna's product needs and desires." Fradet Aff. at ¶ 10. Fradet described tension in the negotiations between Storage-Tek and Cigna in 1997, but notes that tension was part of "nearly every negotiation and that has been the case since [he] began [his] career at Cigna" and that he had "witnessed significantly less of it, however, when Ms. Pascal was the sales representative involved in the negotiations." Id. at ¶ 15.

Fradet also stated that prior to Pascal's arrival at StorageTek, the total amount of Storage Technology product paid for by Cigna in 1992 and 1993 totaled approximately $2 million combined. Id. at ¶¶ 11–12. After Pascal began working on the Cigna account for StorageTek, "Cigna's purchase of Storage Technology product increased substantially" and from 1995–1997, Cigna bought approximately $2.5 million per year from StorageTek. Id. at 13. Total purchases by Cigna from StorageTek from 1995 through 1997 were approximately $8 million. Id. In 1998, after plaintiff was terminated, "Cigna purchases of StorageTek product decreased significantly" and the total amount of Cigna purchases of StorageTek product in 1998 was approximately half of what it had been in 1997. Id. at ¶ 17. Moreover, approximately 75 percent of Cigna's payments to StorageTek in 1998 were the result of orders placed by Ms. Pascal in November and December 1997. Id.

Jeffrey Dacosta, Assistant Director of Cigna, wrote to Kimball on January 20, 1998, asking him to consider reinstating plaintiff and praising her "professionalism, creativity and overall effectiveness in putting together deals." Pl.'s Ex. X. The letter also explicitly notes that StorageTek's sales to Cigna increased significantly during plaintiff's tenure as StorageTek rep to Cigna. See id.

Defendant argues that Dacosta and Fradet were both involved on Cigna's financial side rather than the technical side, and that the complaints by Cigna technical staff were the basis for its decisions to put her on the PIP and then terminate her. However, if plaintiff is believed, CIGNA technical and financial staff were both involved in major purchasing decisions, and her termination led to a decrease in total sales by StorageTek. As all reasonable inferences must be construed in favor of the non-moving party for purposes of summary judgment, the legitimate weight that StorageTek reasonably gave to the alleged complaint by Cigna requires resolution by the fact-finder.

 Plaintiff also contends that other employees with similar performance problems were not put on PIPs or terminated, and that this creates a disputed fact on whether defendant's legitimate nondiscriminatory reasons are pretextual. First, plaintiff points to Frank Kierney as an example of a male rep who failed to meet quota for three years and was not put on a PIP. According to Gordon, he spoke to Frank Kierney about Kierney's performance in early 1997. Gordon dep. at 202. He claims he told Kierney verbally that he had to get on track, and gave him "some unknown time frame, maybe June or September," in which to reach his year-to-date quota. Id. at 202–03. No specific quota or numbers were given to Kierney during this meeting, but Kierney was told that if he failed to improve his numbers StorageTek would seek to replace him on his account. Id. at 203. Gordon claims that the reason he put Pascal on a PIP and only gave Kierney a verbal warning was that

Frank Kierney evidently had a pipeline, and had activities and deals that maybe had already closed, that we had taken to revenue with, that we knew he was going to make his annual quota, and there was no need to put him on a performance improvement plan. He had performed and he had improved, and it was a matter of the revenue showing up on a report like this. Everything we do is based on an annual number and the likelihood of that individual getting to that annual number. And so at this time, my thoughts are that he must have been—I must have known he was going to make the number, or I felt he was doing what he should have been to get to that number ...

*Id.* at 219–20. Gordon also stated that by October, "you have a pretty good idea who is going to make the number." *Id.* at 220.

However, a report dated October 6, 1997, showing quota percentage ranking through August 1997 indicates that Pascal had met 40.29% of her quota and that Kierney had met only 24.36%. *See* Pl.'s Ex. S. Frank Kierney's total sell revenue at the second December 1997 period was approximately $3.2 million, 94.39% of his $3.4 million quota. *See* Pl.'s Ex. T. In February 1998, Kierney's 1997 sales figures were adjusted to show that he made 103.79% of his quota. Plaintiff has offered evidence that makes this figure suspect. According to Michael Mooney, the Financial Services Manager at StorageTek from March 1992 through January 1998, Kimball and Gordon engaged in a practice of shifting credit from sales reps who were well over their quota to those reps who were behind to increase the number of reps meeting quota, and thereby improving their own performance reviews. Mooney claims that credit from Jim Tague, a sales rep who was terminated in 1997, was shifted to "George Pop, Tom Burke and, I think, Frank Kierney, and it might have been

Steve Sullivan, but I'm not sure," at the end of 1997. Mooney dep. at 63. Mooney also stated that at least one rep, Dan Beal, had his quota reduced at the end of 1997. Defendant attempts to discredit Mooney by characterizing him as a disgruntled former employee. Such arguments about his credibility are appropriate for jury determination.

Plaintiff also claims that evidence that Michael Kierney was treated differently than she was rebuts defendant's explanation as to the reasons for her termination. Defendant argues that because Michael Kierney met the terms of his PIP, the fact that he was not terminated is irrelevant and that plaintiff's allegations of pretext and sex discrimination are refuted by evidence that Jim Tague, another male employee, was terminated for not meeting the terms of his PIP. Plaintiff, however, has offered evidence raising a disputed fact about whether defendant relied on her failure to meet her PIP when it terminated her. According to plaintiff, during the January 1998 meeting with Gordon in which she was terminated, Gordon told her "that I was going to be laid off, that the Company was restructuring and that they were eliminating sales reps, and that I was going to be laid off. And I would have a severance package." *Id.* at 185. At that meeting, according to plaintiff, Gordon stated that he did not know whether she had met the requirements of her PIP, and in fact asked *her* if she believed she had met them. *Id.* She also explained that some of the information on sales of equipment from other vendors was not available until January. *Id.* at 186. Although it is undisputed that plaintiff had not in fact met the terms of the PIP because she reached only 84.88% of her quota for 1997, plaintiff's evidence permits an inference that defendant's decision to terminate her was not based solely on this failure.

Plaintiff also argues that because defendant had previously stated that she was terminated as part of a reduction in force, this suggests that the poor performance explanation given now is pretextual. Defendant's answer in this litigation dated June 1, 1998 "admits that Complainant was terminated effective February 12, 1998 due to restructuring and cost reduction." Pl.'s Ex. Y. In the CCHRO hearing, defendant claimed that she was terminated both as part of a RIF and for performance reasons. Although plaintiff was allegedly told when she was terminated that "they didn't need me anymore," a young man was hired as a marketing rep following her termination. *Id.* at 186. Further, the letter from Cigna asking defendant to reconsider the termination has a margin note that indicates that Cigna was told that plaintiff was terminated as part of a business reorganization, not because of performance problems. Finally, defendant has admitted that it did not need to do a RIF at the time plaintiff was terminated and that plaintiff was not in fact terminated as part of a RIF. Gordon dep. at 80.

Defendant now states that it classified her termination as a RIF in order to permit her to receive benefits she would not otherwise be entitled to, and argues that this evidence of good motive necessarily rebuts any claim that it was discriminating. However, a similar argument recently was rejected by the Second Circuit in *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 n. 4 (2d Cir.1998) ("[I]t only shows that Norden was being solicitous—which is not logically related to whether it was also being discriminatory. The kindness or vindictiveness of an employer-defendant does not provide an independent basis for (or the exoneration from) an employment discrimination action. As a result, collateral commendable behavior by an employer cannot serve as an absolute shield from [a discrimination] suit.").

While StorageTek's stated reasons for terminating plaintiff are inconsistent, the inference of pretext plaintiff wishes the Court to draw from the alleged change in reasons for termination is weak, as there is ample evidence prior to her termination that plaintiff's performance at StorageTek was not exemplary: she failed to meet her quota for four consecutive years, she received a low performance ranking on her February review, her poor sales performance was given to her as a reason for putting her on the PIP and for terminating her, and after she was put on the PIP, she failed to attend scheduled meetings or explain her absence. Thus, this is not a case where the question of poor performance was first raised in litigation. *Cf. Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 136 (2d Cir.2000) (finding evidence of pretext where defendant told plaintiff he was terminated as part of a RIF, gave same reason in EEOC proceeding and expressly stated to EEOC that job performance was not a factor, and then changed position and declared that plaintiff was terminated for performance reasons after litigation commenced).

Plaintiff does not, and cannot, rebut the evidence showing that she failed to meet her quota for four consecutive years and did not meet the terms of her PIP. However, drawing all permissible inferences in favor of plaintiff, under the circumstances of Gordon and Kimball allegedly inflating the quotas of various male sales reps, including Kierney—whose sales performance apart from the 1997 year appears to be similar to plaintiff—and the conflicting evidence about plaintiff's performance from Cigna, combined with the evidence of Gordon's alleged preference for male reps on various accounts, a reasonable jury could find that the stated reasons for putting her on the PIP and terminating her are not the only reasons and that sex was a factor

that made a difference in these decisions, thus precluding summary judgment.

## C. *Hostile Environment Claim*

Defendant argues that it is entitled to summary judgment on this claim because plaintiff has failed to show a hostile environment as a matter of law, and even if the evidence she points to did amount to a hostile environment, StorageTek took immediate, appropriate action to stop the harassment after she complained. For the reasons discussed below, although the Court has serious reservations about whether the conduct complained of amounts to a hostile work environment because of sex, the Court cannot conclude at this juncture that no reasonable jury could find in plaintiff's favor on this claim.

■ "To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). To be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

■ In considering whether the environment is sufficiently hostile, the Court must look at the totality of the circumstances. *See id.* at 111 (*citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "One of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . .—

as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Perry v. Ethan Allen Inc.*, 115 F.3d 143, 149 (2d Cir.1997) (*quoting Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987)). In *Harris*, the Supreme Court held that relevant factors include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening and humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23, 114 S.Ct. 367. The Supreme Court has recently reminded that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition on harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

■ Although "isolated, minor episodes of harassment do not merit relief under Title VII, . . . the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Richardson v. New York State Department of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir.1999) (citations and internal quotations omitted). " 'Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment.' " *Id.* (*quoting Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.1997)).

In *Oncale*, the Supreme Court emphasized that because Title VII was not intended to serve as a "general civility code for the American workplace," it "does not prohibit all verbal or physical harassment in the workplace; . . . the critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, in addition to establishing that the harassment affected the terms and conditions of her employment, plaintiff must also prove that she was "subjected to the hostility because of her membership in a protected class. In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes." *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999) (*citing Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

When plaintiff began working at StorageTek in 1994, "there was rough talk, and the guys would tell jokes and stuff like that . . . Off-color jokes. I don't remember any of them . . . They were sexual in nature, bad language, things of that regard." Pascal dep. at 127. After Steve Gordon got promoted and Steve Candela became her office mate, the problem intensified, and "[i]t rose to the point where you couldn't do business anymore in your office because of the foul language that was going on. It halted business." *Id.* Plaintiff shared an office with Candela that was separated by a partial partition, and his constant swearing interfered with her ability to talk to clients. *Id.* at 129–30. During one conversation with a CIGNA representative in 1996, Candela's language was so bad that plaintiff and Brad Cahill, another sales rep, found it impossible to talk to the Cigna rep

and complained to Kimball about Candela. In response, "Joel rolled his eyes, looked at us, looked at Brad and myself with a disgust [sic] look, and left," without saying anything to Candela. *Id.* at 131. She "complained to management quite often" but does not recall whether she ever complained directly to Candela. *See id.* She told Gordon in 1996 that Candela had a foul mouth, and Gordon gestured in response, "just kind of a roll your eyes and walk away, shrug it off." *Id.*

Pascal complained to Kimball in July 1997 about Candela's language. Kimball dep. at 186–87. In response, Kimball spoke with another woman in the office, who denied having problems with Candela; her office, however, was not situated near to Candela's. *Id.* at 187. Gordon warned Candela about his language in July 1997 and instructed him to cease using profanity at work. *Id.* Although plaintiff alleges that Kimball once used "foul language" towards her, she does not recall whether Candela ever did so. *Id.* at 130.

According to plaintiff, "disparaging jokes about women and other minorities were common." Pascal Aff. ¶ 9. In particular, plaintiff recalls instances in which Candela made degrading remarks about women:

> In the elevator sometimes, there would be other women in the elevator. And Candela, Steve Gordon and the other guys that were in the elevator with me—I don't know who they all were—would make remarks about women that worked in the building, you know. And sometimes it wouldn't be verbal remarks but, you know, gestures with their hands, to indicate like, you know, if they were good looking and the size of their chest, whatever. And they giggled. And I would walk away from that. . . . They would recount the night in the bar—a

night in the bar—where I guess it was Dan Beal who was a rep, was trying to kiss the barmaid, or putting salt on her neck because his wife couldn't put out because she had morning sickness or something like that. And conversations like that he [Candela] would be involved with. And he would probably say: Couldn't f___ing put out, you know, because that was his favorite word.

Pascal dep. at 132.

In the summer of 1997, Gordon publicly commented that plaintiff was "an old broad, but she looks ok." *Id.* at 129. In June 1997, Steve Candela taped above her desk a photograph of plaintiff, Kimball and Ray Hermo at an outing seated at a table where plaintiff had her hands in her lap with a note asking "where are your hands?" or "what are you doing with your hands?" *Id.* at 145–46. Plaintiff asked Gordon who had put the picture there, and "he kind of laughed and he said: Steve Candela did it." *Id.* at 146. The picture was taken down after a week. *Id.;* Declaration of Janet Pascal re: Photograph, Pl.'s Ex. M. In addition, on a few occasions, plaintiff was invited by male workers, including Gordon one time, to go with them to a topless bar; according to plaintiff, they laughed after inviting her. *See* Pascal Aff. ¶ 9. During this same time period, another co-worker, Angelo Carpino, had a plaque on his office wall reading "something about sailors have more fun, they get blown offshore." *Id.* at 141. According to plaintiff, during that. the September 1997 meeting with Linda Williams, she complained about Candela's use of foul language, expressed concern about the account assignments, and told her about the plaque and the harassment. *Id.; see also* Pascal Aff. ¶ 14.

In response to plaintiff's complaints, Gordon sent an email to Candela on September 15, 1997, warning him about inappropriate language at the office. *See* Def.'s Ex. 7. Candela responded by stating that he no longer used foul language and if anyone had a problem, they should speak to him directly. *Id.* There is no evidence in the record that Gordon took any additional measures to investigate Candela's use of obscene language after his denial. Similarly, Williams admitted during her deposition that she never interviewed Candela about Pascal's allegations of harassment. Williams dep. at 55.

Pascal claims that after September 1997, Candela's use of obscene language continued unabated on a daily basis. Michael Mooney also stated that he noticed no change in Candela's language until he left in January 1998. Mooney dep. at 145. Moreover, following her complaint, plaintiff "noticed that the plaque with the caption, 'Sailors have more fun, they get blown offshore,' continued to hang in the office. . . . In late December of 1997, a calendar of bare breasted women was tacked near the plaque." Pascal Aff. ¶ 16. She also stated that after she was presented with the PIP in October 1997, she did most of her work at home and at her accounts in order to avoid Mr. Gordon and the environment at the East Hartford office created in part by Candela's language. *Id.* at ¶ 15. According to plaintiff, working from Cigna because of the discomfort caused by Candela led her to miss scheduled meetings in late 1997.

*1. Severe and pervasive conduct based on sex*

Defendant argues that obscene language that was not directed towards plaintiff, combined with a few isolated incidents, does not amount to a hostile environment as a matter of law. Plaintiff, in turn, claims that the constant use of offensive and sexually explicit language by Candela, sexually explicit discussions about other female employees in her presence, the photograph

targeting her in a sexualized manner, and a plaque containing a sexual joke, all in the context of a predominantly male environment and following her complaints about such conduct, do amount to a hostile environment.

In *Newtown v. Shell Oil Co.*, 52 F.Supp.2d 366, 372 (D.Conn.1999), the plaintiff's hostile environment claim was based on her allegations that she was subjected to two incidents of offensive name-calling based on her sex and a co-worker frequently called her "woman" in a derogatory fashion. Applying the *Harris* factors, the court denied summary judgment, noting that whether "the use of offensive epithets focusing on plaintiff's sex ... occurred frequently enough in the workplace to be deemed pervasive is a question of fact best left to a jury. Drawing all reasonable inferences in plaintiff's favor and looking at the totality of the circumstances, a reasonable jury could find that the discriminatory conduct was sufficiently pervasive to create a hostile or abusive work environment."

In contrast, in *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 319 (2d Cir. 1999), the Second Circuit affirmed a grant of summary judgment on a hostile environment claim alleging generally rude behavior by her supervisor, pictures of nude and partially undressed men posted in plaintiff's workplace and one instance of sexual banter between two male co-workers. The court noted first that plaintiff had offered "no indication that [her supervisor] treated women more harshly than men," and concluded that the remaining conduct, "while arguably inappropriate in a work setting, do[es] not rise to the level of actionable conduct." *Id.* Applying the factors from *Harris*, the court found that while plaintiff was exposed to the photographs on a daily basis, the objectionable conduct was not severe, physically threatening or humiliat-

ing, and plaintiff had offered no evidence that she was hampered in her job by the photographs or the sexual banter, and concluded that "[u]nder the circumstances of this case, a jury could not reasonably find the existence of a severe, pervasive atmosphere of sex-based hostility at the Met." *Id.*

Plaintiff has not offered evidence from which to conclude that Candela's use of "pool room" language, in particular the "f-word," admittedly not directed at her, was directed at women or more offensive to women than to men. Indeed, plaintiff's evidence suggests that men as well as women had problems with some of Candela's language. *Cf. Brennan*, 192 F.3d at 319. However, as in *Newtown*, there is some evidence in the record suggesting that plaintiff and women generally were targeted by Candela and other male co-workers as the butt of jokes and comments such as the photograph, the invitations to strip bars, and the lewd remarks about various women in the building.

In *Badlam v. Reynolds Metals Co.*, 46 F.Supp.2d 187, 196 (N.D.N.Y.1999), the court rejected the employer's argument that because the work environment was offensive to both men and women, it was not based on sex. The court noted that "[w]hile it is true that male and female employees alike were exposed to pornographic materials and offensive conduct and language, there is evidence that certain harassment was directed only at the female plaintiffs," including numerous pornographic drawings specifically referencing plaintiffs and the fact that plaintiffs were constantly referred to by offensive terms "usually associated with females." Here, while plaintiff's evidence is not as strong as that offered by the *Badlam* plaintiffs, viewing all inferences in plaintiff's favor, a reasonable juror could find that in the context of a predominantly

male work environment, the comments about women and the specific incidents targeting plaintiff were harassment because of plaintiff's sex.

Applying the *Harris* factors, plaintiff alleges constant use of sexualized language and jokes by her co-workers, to which she was exposed on a daily basis. In addition, the fact that plaintiff witnessed Candela and other co-workers make derogatory remarks and gestures about other female workers, even though those comments were not directed towards her, is relevant in considering whether the totality of the circumstances amounts to a hostile environment. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) ("a racial [or sexual] epithet need not be directed at a plaintiff in order to contribute to a hostile environment"); *Perry v. Ethan Allen Inc.*, 115 F.3d 143, 150 (2d Cir.1997) ("Evidence of harassment of women other than Perry, if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment ..."). Finally, although none of the alleged conduct was physically threatening, a picture of plaintiff with a supervisor and a co-worker was doctored with a note asking "where are your hands?" which a reasonable jury could find humiliating. Unlike the plaintiff in *Brennan*, Pascal has also offered some evidence that the environment interfered with her ability to do her work.

■ Under all the circumstances here, plaintiff has provided evidence of specific harassment directed at her on the basis of her sex—the photograph and the multiple invitations to strip clubs—combined with disparaging jokes and comments about women, favorable treatment of male employees through the alleged quota shifting and offensive language. Although the jury might very well find that this behavior was not so severe as to alter the terms and conditions of a reasonable person's employment, the Court cannot conclude that no reasonable jury could find that this the conduct was sufficiently severe and pervasive to create a hostile work environment. *See Newtown v. Shell Oil Co.*, 52 F.Supp.2d 366, 372 (D.Conn.1999) (noting that while the court was doubtful that the conduct rose to the level of a hostile work environment, as "the Second Circuit has repeatedly cautioned in employment cases, reasonable jurors might disagree").

### 2. StorageTek's liability

■ The next step is to determine whether the discriminatory conduct may properly be imputed to StorageTek. "When harassment is perpetrated by the plaintiff's co-workers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " *Perry v. Ethan Allen Inc.*, 115 F.3d 143, 149 (2d Cir.1997) (*quoting Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir. 1994)).

As discussed above, most of the harassment plaintiff complains about was committed by Candela, her co-worker. Plaintiff argues that because Gordon, her supervisor, was present during several incidents, the Court should determine liability based on the standard for harassment by supervisors. Although plaintiff's evidence of Gordon's presence during the alleged harassment is relevant to show knowledge by StorageTek of the harassment by Candela and the possible lack of an appropriate remedial response, plaintiff points to no acts of harassment committed *by* Gordon. Therefore, the appropriate analysis is for harassment by co-workers. As it is undisputed that StorageTek had a harassment complaint procedure, plaintiff must show

210

both that StorageTek knew of the harassment and did not respond adequately.

The Second Circuit has cautioned that " '[i]f the evidence creates an issue of fact as to whether the employer's action is effectively remedial and prompt, summary judgment is inappropriate.' " *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 440 (2d Cir.1999) (*quoting Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998)). In *Richardson,* the court reversed a grant of summary judgment on the adequacy of the employer's remedial response, finding that although the defendant responded to some of plaintiff's complaints of racial harassment, there were other incidents in response to which the defendant took no action, and harassment continued after plaintiff made her complaints. *Id.* at 442. The court also noted that one investigator had previously found that the environment was "like a lynching," and had concluded that all the employees she interviewed lacked racial and cultural sensitivity. Under these circumstances, the court found that while a fact-finder could conclude that the response by the defendant was adequate, the court "could not say as a matter of law that the record evidence compels only that result." *Id.*

█ Here, plaintiff alleges that she complained about Candela's conduct to Kimball and Williams. Although defendant claims to have responded promptly and adequately to plaintiff's complaints, plaintiff has offered evidence showing that Candela's use of offensive language did not stop after Gordon's email, and Candela's response to the reprimand from Gordon denied using offensive language. There is no evidence in the record that Gordon took any further action to follow up with Candela following his denial. Williams also admitted that she *never spoke to Candela* in investigating the complaints. In addition,

Gordon allegedly responded to plaintiff's complaint about the photograph by laughing at her. Drawing all inferences in plaintiff's favor, a reasonable jury could conclude that defendant's response was not adequate. Therefore, defendant is not entitled to summary judgment on this claim.

As noted previously, this is a close call. However, drawing all inferences in plaintiff's favor as is required on summary judgment, the Court finds that judgment on plaintiff's hostile environment claim is inappropriate at this juncture. Should the evidence adduced at trial fail to meet the standard required by law to establish severe and pervasive harassment, however, the Court would of course entertain a Rule 50 motion from defendant.

## D. *Age Discrimination Claims*

### 1. *Prima facie case*

█ In support for her age discrimination claim, plaintiff points to a statements allegedly made by Steve Gordon that "I was old, but I looked ok, you know. People came into the office a lot of times from like New York or somewhere like that. He would say: She's an old broad, but she looks ok." Pascal dep. at 129. Plaintiff does not specify when these comments were made by Gordon. She also claims that she overheard Gordon state that James Tague was "old" and that "he's got to go," and refer to Don Corkum, another employee as old and ready for retirement. *See* Pascal Aff. at ¶ 10. In 1997, plaintiff was 46. She asserts that two younger men were hired by Gordon in the summer of 1997, Kenneth Dougherty, age 25, and Christopher Gray, age 26, and that following her termination, two other young men were hired, Jeremy Lombardo, age 25, and Michael Mussilli, age 31. She also states that her Hartford Steam Boiler account was given to Michael Kierney, age 29, and that Gordon told her he was considering giving her Cigna ac-

count to Steve Sullivan, age 29, Dan Beal, age 29, or Steve Candela, age 40. Finally, she points out that Jim Tague was 55 when he was discharged in 1997.

■ The standard for age discrimination claims under the ADEA is the same as for Title VII. *See Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Bearing in mind that "where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate," the question is whether plaintiff has provided enough evidence to permit a reasonable fact finder to conclude that she was terminated because of her age. *Carlton*, 202 F.3d at 134. In *Carlton*, the Second Circuit reversed a grant of summary judgment on an age discrimination claim where the 57 year old plaintiff relied on evidence that his duties were transferred to younger employees, and that his supervisor suggested that he "retire" during a meeting discussing his termination, finding first that this was enough to meet the prima facie case. *Id.* "Although evidence of one stray remark by itself is usually not sufficient proof to show age discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of all the evidence.'" *Id.* (*quoting Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir.1998)).

Here, plaintiff's evidence about her termination is very similar to that in *Carlton:* one age-related comment directed at her, and her replacement by a younger man on the Hartford Steam Boiler account, and then by two younger men following her termination. Therefore, the Court concludes that she has made out a prima facie case of age discrimination.

*2. Pretext*

Defendant claims that customer complaints and poor performance prompted it to reassign the Hartford Steam Boiler ac-

count and that she was put on the PIP and terminated for poor performance, thereby satisfying its burden of producing a legitimate nondiscriminatory reason. In order to survive summary judgment, plaintiff must demonstrate evidence from which a reasonable fact-finder could conclude that the proffered reasons are pretextual, and that plaintiff's age was a motivating factor for her the decision.

In *Carlton*, the defendant had claimed that the plaintiff's termination was the result of a reduction in force and performance problems. The Second Circuit found that as defendant had hired someone twenty-five years younger than plaintiff within three months of his termination and had not considered re-hiring plaintiff for his position, the evidence suggested that "perhaps some other motive—beyond the company's finances—motivated [defendant's] decision." 202 F.3d at 136. The court also found suspect the poor performance allegations, noting that poor performance had not been raised as a reason for plaintiff's termination until after a lawsuit was filed; moreover, plaintiff had never received a negative performance evaluation, while other underperforming employees had their salaries reduced or were terminated with forms indicating the reason. *Id.* at 137. The court concluded that "in light of the dispute in the proof on these issues, a rational jury could reject both of [defendant's] non-discriminatory reasons. The conflict between plaintiff's evidence establishing its prima facie case and [defendant's] proof in support of its nondiscriminatory reasons creates genuine issues of material fact that can only be decided by a factfinder after trial." *Id.*

■ Here, there is no such conflict. Although plaintiff's evidence suggests that defendant's reason was pretextual, she has offered nothing that suggests that age was a motivating or determining factor. Plain-

tiff does not allege that Gordon stated that he wanted a "young guy" to take the client out drinking, merely that he wanted a "guy." She has not offered any evidence suggesting that the client had not in fact complained about her performance, or that the client's complaint was age-related. Therefore, there is nothing from which a reasonable jury could find that the defendant's stated reasons "are actually a pretext *and* that the real reason for [her removal] was [her] age." *Id.* at 136.

Frank Kierney, a sales rep who according to plaintiff failed to meet his quota for three years and then only met the quota in the fourth year because of a scheme of credit shifting, was 60 years old in 1997. Thus, while Kierney provides a useful comparator from which to conclude that sex discrimination may have been involved with her termination, he provides absolutely no support for her age discrimination claim. Moreover, plaintiff's evidence of credit-shifting, which indicates that male employees who failed to meet their quotas were given extra credits to help them meet their quotas while she was not, supports her sex discrimination claim but not her age discrimination claim. In addition to Kierney, Tom Burke, another alleged beneficiary of the credit-shifting, is ten years older than the plaintiff; plaintiff thus cannot show that younger employees were the main beneficiaries of the credit-shifting. While pleading in the alternative is a permissible approach, plaintiff may not selectively rely on evidence that supports some of her claims and then ask the Court to disregard that evidence when it contradicts her other claims.

Finally, plaintiff does not have any evidence of an express preference by her supervisors for younger reps analogous to her evidence of a preference for male reps that could support an inference that defendant's reliance on her poor performance is

pretextual and that age was a motivating factor. The statement about plaintiff looking "good for an old broad," unlike the statement made in *Carlton* suggesting that plaintiff should "retire," here bears no apparent connection to the decisions to take away her accounts and terminate her.

Under these circumstances, plaintiff has not come forward with sufficient evidence to permit reasonable jurors to conclude that age discrimination was a motivating reason for her discharge, and defendant is therefore entitled to summary judgment on this claim.

### E. *Retaliation Claims*

Plaintiff asserts that defendant retaliated against her for her complaints about the hostile environment and the discrimination in account transfers by putting her on the PIP and eventually terminating her.

To establish a prima facie case of retaliation, plaintiff must show that: 1) she engaged in protected activity; 2) that the employer was aware of; 3) the employer took adverse action against the plaintiff; and 4) a causal connection between the protected activity and the adverse action. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir.1998). It is undisputed that plaintiff has met the first three elements as to both acts of alleged retaliation: as she complained to Williams about Candela's harassment and the alleged discrimination in September 1997, Storage-Tek therefore had knowledge of her complaints, and she was put on the PIP and terminated. However, defendant argues that it is entitled to summary judgment on the retaliation claims because plaintiff cannot show any causal link between her complaints of harassment and the adverse employment actions taken against her.

"[T]emporal proximity can give rise to a reasonable inference of a causal

connection between the protected activity and the adverse employment action." *Newtown*, 52 F.Supp.2d at 374. Here, plaintiff was put on her PIP only two weeks after speaking with Williams about the account transfers and the hostile environment. As discussed, other reps with similar sales performances were not put on PIPs, and there is a dispute of fact with respect to plaintiff's performance and defendant's reliance on Cigna's complaints. This provides at least minimally sufficient evidence from which a reasonable fact-finder could infer a causal connection. *See id.* (poor performance review one month after complaint of harassment was sufficient to allow a jury to infer a causal connection). In addition, following the incident with the Cigna account and the PIP, plaintiff complained to Gordon that she was unhappy with the way it had been handled, and her lawyer wrote a letter complaining of retaliation on October 10, 1997. Although these complaints took place three months prior to her termination, given the two month trial period for the PIP, a reasonable jury could infer that the termination was causally connected to plaintiff's complaints of discrimination from the fact that defendant put plaintiff on the PIP immediately following her protests about the Cigna incident.

Once plaintiff has met her prima facie case of retaliation, the burden shifts to the defendant to produce evidence of a legitimate nondiscriminatory reason for the adverse action. Defendant claims that her poor performance and customer complaints were the reasons for putting Pascal on the PIP and terminating her.

■ In support of her allegations of pretext, plaintiff's affidavit claims that "[t]he first time that either Steve Gordon or Joel Kimball mentioned to me about an 'alleged' relationship problem with lower level technicians at Cigna was when Steve Gordon told me he was taking the Cigna account from me because he wanted to give the account to a male sales representative. I do not recall reading or seeing the sentence referring to my relationship with Cigna in my February 1997 review." Pascal Aff. ¶ 17. There is an additional dispute regarding the timing of the complaint by Bob Radley, from Cigna, about Pascal's performance. Kimball claims the complaint occurred on August 19, 1997. However, during his deposition, Radley said the conversation occurred between May and June, to the best of his recollection. Radley dep. at 19. To the extent that defendant waited months before mentioning this alleged complaint, and given plaintiff's evidence of her good relationship with Cigna, defendant's decision to raise the Cigna complaint only after she complained to Gordon about discrimination provides some support for her claim of retaliation.

Defendant also points to the fact that plaintiff received the lowest possible performance evaluation in February 1997 as evidence that its motive to put her on the PIP existed before September 1997, and contends that the four month time lapse between her complaints to Williams and her termination is too great to create an inference of retaliation. However, as noted above, the decision to put her on the PIP followed just two weeks after the complaints, and the PIP provided at least two months probationary period. The fact that plaintiff was then fired for failing to comply with her PIP, given plaintiff's evidence of credit-shifting to male employees by Kimball and Gordon, casts sufficient doubt on defendant's stated reasons for discharging plaintiff to raise a genuine issue of material fact about whether retaliation was a motivating factor in the PIP and termination decisions.

### F. *Intentional Infliction of Emotional Distress*

Defendant argues that it is entitled to summary judgment on this count because

plaintiff has not demonstrated that its conduct was sufficiently extreme and outrageous as a matter of law. In response, plaintiff contends that the circumstances of her termination and the hostile environment to which she was subjected are sufficient to survive summary judgment.

 Under Connecticut law, to prove intentional infliction of emotional distress, plaintiff must show (1) that the defendant intended to inflict emotional distress, (2) that its conduct was extreme and outrageous, (3) that the defendant's conduct caused the plaintiff distress and (4) that the distress suffered by the plaintiff was severe. *See DeLaurentis v. City of New Haven,* 220 Conn. 225, 266–67, 597 A.2d 807 (1991). Conduct is deemed extreme and outrageous where it "exceeds all bounds usually tolerated by a decent society." *Appleton v. Board of Educ. of the Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059 (2000) (internal quotations and citations omitted). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (quoting 1 Restatement (Second), Torts § 46, cmt. d (1965)).

 Here, drawing all inferences in favor of plaintiff, defendant openly expressed a preference for male reps, put her on a performance review plan and eventually terminated her not because of her poor performance but because of her sex and complaints. In addition, her supervisors failed to adequately protect her from an arguably sexually hostile work environment created by her co-workers. Such conduct, although unlawful under both Title VII and the Connecticut Fair Employment Practices Act, does not arise to the level of severity and outrageousness contemplated by the standard for intentional infliction of emotional distress.

" 'The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.' . . . The employer's motive for not hiring an employee is not relevant to whether the act was outrageous; it is the act itself which must be outrageous." *Huff v. West Haven Board of Educ.,* 10 F.Supp.2d 117, 123 (D.Conn.1998) (*quoting Parsons v. United Technologies Corp.,* 243 Conn. 66, 89, 700 A.2d 655 (1997)).

Plaintiff's evidence is insufficient to establish that defendant's conduct here was extreme and outrageous. Although there is a dispute as to the adequacy of defendant's response to her complaints of harassment by co-workers, the alleged deficiencies in its response are not "utterly intolerable" in a decent society. Similarly, although plaintiff's termination may have been motivated by sex discrimination or retaliation, the manner in which she was terminated was not outrageous. *See Ericson v. City of Meriden,* 113 F.Supp.2d 276, 292 (D.Conn. 2000) ("The fact that Plaintiff's co-workers were viewing a videotape with sexual content during working hours, the comments they made to her during that incident, and their subsequent retaliatory conduct, if proven, may be offensive but cannot be said to be atrocious or utterly intolerable by society. Neither can plaintiff's job transfer, albeit to an undesirable location, be termed extreme or outrageous."); *Newtown v. Shell Oil Co.,* 52 F.Supp.2d 366, 374 (D.Conn.1999) (granting summary judgment on intentional infliction of emotional distress claim where plaintiff alleged sexual harassment by co-workers and wrongful termination); *Dobrich v. General Dynamics, Corp.* 40 F.Supp.2d 90, 105 (D.Conn.1999) (granting summary judgment where plaintiff alleged that employer had failed to stop multiple incidents of verbal and physical harassment because "plaintiff has not alleged that any of the

employment actions taken by defendants were done in a manner so egregious or oppressive as to rise to the level of extreme and outrageous").

At oral argument, plaintiff's counsel argued that Gordon's two acts of allegedly informing plaintiff that her accounts were being transferred to male representatives who could take the clients out drinking were sufficiently outrageous to survive summary judgment. While such statements may be offensive and outrageous in the sense that they lend themselves to obvious inferences of gender preferences, without more, the Court cannot find that they amount to egregious or oppressive conduct within the contemplation of this tort.

In the absence of sufficient evidence in the record to support a finding that defendant's actions were extreme and outrageous, defendant is entitled to summary judgment on this claim.

## III. Conclusion

For the reasons discussed above, defendant's motion for summary judgment [Doc. 31] is granted in part and denied in part. Summary judgment is granted as to plaintiff's age discrimination and intentional infliction of emotional distress claims (Counts IV, V, X, XI, XII). Defendant's motion is denied as to the remaining counts.

IT IS SO ORDERED.